818 F.2d 1135
 16 Collier Bankr.Cas.2d 1461, Bankr. L. Rep. P 71,853
In the Matter of MISSIONARY BAPTIST FOUNDATION OF AMERICA,
et al., Debtor.
Robert B. WILSON, Trustee, Plaintiff-Appellee,
v.
Robert G. HUFFMAN, Defendant-Appellant.
 No. 86-1160.
 United States Court of Appeals,
Fifth Circuit.
 May 26, 1987.
 
 James V. Hoefner, Austin, Tex., for defendant-appellant.
 Robert B. Wilson, John C. Sims, Lubbock, Tex., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Texas.
 Before BROWN, RANDALL and HIGGINBOTHAM, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 Robert G. Huffman appeals from the district court's affirmance of the bankruptcy court's order subordinating his claim in the amount of $119,005 under 11 U.S.C. Sec. 510(c). We reverse and remand to the bankruptcy court for proceedings consistent with this opinion.
 
 I.
 
 2
 The factual background of this case has been set forth several times and at great length in the opinions rendered heretofore in connection with this case. However, we will restate the facts necessary to an understanding of the issues raised in this, the second appeal to this court.
 
 
 3
 Land Wall is the president, controller and director of the Missionary Baptist Foundation of America, Inc. ("MBFA" or "debtor"), a religious non-profit corporation. In October of 1980, a petition for reorganization of MBFA and its seven wholly-owned subsidiaries, together considered as one entity, was filed under Chapter 11 of the Bankruptcy Code. The debtor's schedules included two promissory notes which are the subject of this appeal. These notes represent obligations of MBFA to Robert G. Huffman, the appellant in this case.
 
 
 4
 In 1975, Huffman and Wall established a partnership known as Wall and Huffman ("the partnership" ), and a corporation called West Texas Home Health Care, Inc. ("West Texas Homes" ). West Texas Homes was a nursing home management corporation, fifty percent of which was owned by Huffman and fifty percent of which was owned by Wall. The partnership purchased the Dumas Convalescent Center, a nursing home in Dumas, Texas, borrowing $228,000 from a commercial lender to cover the downpayment and the costs of the necessary improvements. Shortly thereafter, the partnership contracted with West Texas Homes for the operation of the nursing home. Wall handled the financial details while Huffman was involved only in the management of the home.
 
 
 5
 Early in 1977, Wall individually purchased the Crestview Home in Throckmorton, Texas. Wall entered into a management contract with West Texas Homes for the Crestview home. That contract was identical to the management contract covering the Dumas home. On February 1, 1977, Wall transferred his interest in Crestview to Pampas Enterprises ("Pampas"), a partnership composed of Wall and three of his family members. On the same date, Pampas subleased the property to West Texas Homes.
 
 
 6
 The Crestview and Dumas homes were sold to MBFA in April of 1977. Under the terms of the package sale, MBFA assumed all indebtedness encumbering the properties and agreed to pay $148,014 for the equity. Huffman and Wall, individually, each received a promissory note in the amount of $74,007, secured by a second lien on the Dumas property. Through this transaction, Huffman shared equally with Wall in the equity in the Crestview home, despite the fact that Huffman apparently lacked a proprietary interest in the property. The security was eventually released by Huffman to enable MBFA to sell the homes.
 
 
 7
 Contemporaneously with the sale of the Dumas and Crestview homes to MBFA, West Texas Homes assigned its contractual rights in both homes to MBFA, receiving in return two unsecured promissory notes, each in the amount of $88,860. Subsequently, West Texas Homes was purportedly dissolved[1] and in the distribution of its assets, its shareholders, Huffman and Wall, each received one of the notes. The note, made payable to West Texas Homes, was "transferred" to Huffman via the name of Wall and Huffman's corporation handwritten together with Wall's signature on the back of the note.
 
 
 8
 Through August of 1980, MBFA made periodic payments to Huffman on the $74,007 and $88,860 notes.[2] When the Chapter 11 petition was filed, MBFA's books reflected a balance of $37,170.96 owed to Huffman on the $74,007 note. Although the corporate books did not evidence the $88,860 note, MBFA's representatives acknowledged the existence of a debt in that amount to West Texas Homes. The debtor's schedules reflected an aggregate balance on the two notes in favor of Huffman in the amount of $119,005.
 
 
 9
 The trustee in bankruptcy, Robert B. Wilson, formally objected to Huffman's claim, contending that MBFA was not indebted to Huffman on the $88,860 note. Additionally, Wilson contended that MBFA was not indebted to Huffman for the $37,170.96 balance because the $74,007 note was invalid as a product of an arrangement by Huffman and Wall designed to improperly extract monies from the debtor MBFA. The bankruptcy court found, inter alia, that Wall's ownership or control of the debtor placed him within the definition of "insider of the debtor," under 11 U.S.C. Sec. 101(25)(B). Recognizing that Huffman's connection with MBFA differed from Wall's connection with MBFA, the bankruptcy court then considered whether Huffman could be characterized as an insider because of his business relationship with Wall and his stock ownership in West Texas Homes.
 
 
 10
 The bankruptcy court found that MBFA's acquisition of the Dumas and Crestview homes and West Texas Homes' contractual position were effected by Wall on a less than arms-length basis. The court concluded that West Texas Homes was an affiliate of the debtor under 11 U.S.C. Sec. 101(2)(B), and that the conveyance of the $88,860 note to Huffman was an insider transaction. Further, the court determined that the $74,007 indebtedness to Huffman, in his capacity as general partner of a partnership which controlled the debtor, likewise resulted from an insider transaction.
 
 
 11
 Based on these findings, the bankruptcy court allowed the $119,005 claim but ordered it subordinated, under 11 U.S.C. Sec. 510(c)(1), to those of the general unsecured creditors. The district court affirmed the bankruptcy court in all respects, concluding that there had been sufficient findings to justify the subordination of Huffman's claim under the three-pronged test this court set out in Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 700 (5th Cir.1977): (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. See id. at 700; accord Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.), 622 F.2d 709, 713 (5th Cir.1980).
 
 
 12
 On appeal to this court, Huffman contended that the bankruptcy court erred in imputing insider status to him because of MBFA's association with West Texas Homes and the Wall and Huffman partnership. Further, Huffman contended that there were insufficient findings to support the application of the equitable subordination doctrine outlined in Mobile Steel. A panel of this court disagreed with Huffman's first contention and agreed with his second. See Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.), 712 F.2d 206 (5th Cir.1983). The panel was persuaded that as to the $88,860 promissory note, Huffman was an insider of an affiliate within the meaning of 11 U.S.C. Sec. 101(2). Further, the court found that by definition, an insider of an affiliate is an insider of the debtor under 11 U.S.C. Sec. 101(25)(E). The panel held that because of the interrelationship of all transactions, the finding of Huffman's insider status with respect to the $88,860 note was dispositive also as to the $74,007 note, inasmuch as the components of Huffman's claim were not sufficiently discrete to warrant separate treatment. Therefore, the panel affirmed the fact-finding that Huffman was an insider. However, because the bankruptcy court, upon its finding that Huffman was an insider, subordinated Huffman's $119,005 claim without assigning specific reasons for the subordination, the panel found itself unable to conclude that the trustee had discharged his burden of proof under Mobile Steel. Thus, the panel found it necessary to remand the case to the bankruptcy court for the entry of findings required for application of this circuit's equitable subordination formula. The panel directed the bankruptcy court, on remand, to set forth its findings and conclusions under the three prongs of the test set out in Mobile Steel.
 
 
 13
 On remand, the bankruptcy court, after holding a hearing, filed a memorandum opinion and order on February 25, 1985. The court noted that "Huffman was not a director of the corporate debtor, he was not an officer of the corporate debtor, and, at least as far as any period of time relevant to this memorandum is concerned, he was not an employee of the corporate debtor." Missionary Baptist, 48 B.R. at 888. Huffman's statutory relationship as an insider of MBFA represented, in the court's view, Huffman's sole contacts with MBFA and Huffman had not used MBFA as a "mere instrumentality or alter ego." Id. The court found that the trustee presented no evidence of overt acts of misconduct by Huffman. Id. at 888-89.[3]
 
 
 14
 The court went on, then, to inquire into whether Wall, Huffman's partner and the owner with Huffman of all of the capital stock in West Texas Homes, had engaged in inequitable conduct and, if so, whether that conduct could be imputed to Huffman. The court, taking judicial notice of files and records in related proceedings (relying on the general stamp of approval by this court found in its prior opinion in this case, see Missionary Baptist, 712 F.2d at 211), stated that "Wall dealt with MBFA as his mere instrumentality or alter ego. As an officer, director, and controller he breached the fiduciary relationship imposed by those offices in his self dealing with the debtor and its affiliates." Missionary Baptist, 48 B.R. at 889. The court went on to state that Wall "transferred monies and assets between the subordinate entities and the parent entity with impunity. Although the nonprofit debtor corporation had no voting securities Wall controlled the corporate activities with an 'iron hand.' " Id. Although the court did not impute to Huffman all of Wall's dealings,[4] the court did impute those dealings related to the Dumas and Crestview homes. The court did not identify specific reasons justifying the decision to impute the conduct but rather, simply said that "[a]s insider with Wall any inequitable conduct on the part of Wall in connection with the transactions involving those two homes only should be imputed to Huffman." Id.
 
 
 15
 The bankruptcy court found that Wall's conduct in the Dumas and Crestview transactions was inequitable within the first prong of the Mobile Steel test and, by imputing to Huffman Wall's "inequitable conduct," the court found the first prong of the Mobile Steel test satisfied. The court noted that there were at least two different fiduciary relationships that existed between Wall and MBFA--"the fiduciary relationship imposed by Sec. 101(25) of the [Bankruptcy] Code which places an 'insider' in that relationship" and an "actual" fiduciary relationship existing by virtue of Wall's status as officer, director, and controller of MBFA. Id.
 
 
 16
 The court found that Wall engaged in self-dealing with MBFA in the two transactions, causing the Dumas and Crestview homes "to be sold to MBFA for considerably more consideration than that received by MBFA when it subsequently sold them." Id. Further, the court said that "[t]he price received by Wall and Huffman in the package exceeded the fair value of the property interests conveyed by them to MBFA." Id. After making these two specific fact-findings, the court made the blanket statement that "[i]t was wrong for Wall to deal with the debtor corporation at all, regardless whether the corporation profited. A trustee, an executor of an estate, a corporate officer or director, or any similar fiduciary is prohibited by common sense and by law from dealing with his trust." Id. at 889-90. However, immediately thereafter in the opinion, the court seemed to ignore that statement by again focusing on its view of the transactions as "bad deals" for MBFA. The court found that "the price received by MBFA when it sold the two homes was substantially less than that price at which Wall and Huffman sold those two homes to MBFA." Id. at 890. A fair reading of the opinion seems to be that the court found that even absent a legal prohibition against insiders dealing with their corporations, Wall's conduct was "inequitable" because the two transactions were bad deals for the debtor.
 
 
 17
 While acknowledging the truth in Huffman's argument that the sale to MBFA was a fully leveraged transaction and that one normally can receive a higher price for fully leveraged property than one can receive in a transaction in which some cash consideration is sought, the court said:
 
 
 18
 However, MBFA was a nonprofit corporation through which a considerable amount of money passed each year. Those monies could not be diverted to the control group except for salaries and nominal expenses. Whether Wall intended from the beginning that those notes would be paid from the assets of the nonprofit corporation is not reflected in the record. However, that precisely was what happened. Huffman's notes and Wall's notes were regularly paid each month from corporate assets, even where creditors who had actually furnished services and goods were not being paid.
 
 
 19
 Id. The court went on to say that, for that reason, it was not persuaded by Huffman's argument that he showed good faith when he released his lien on the Dumas home to permit MBFA to sell the two homes. The court said that Huffman "was continuing to receive those payments from MBFA assets, regardless whether the notes were secured or unsecured. Fair inference from the evidence adduced at trial permits the conclusion that Wall intended that his notes and Huffman's notes would be paid by MBFA when no other obligations were being paid." Id. (footnote omitted).
 
 
 20
 With respect to the second element of the Mobile Steel test, the bankruptcy court concluded that it was "apparent" that the misconduct imputed to Huffman conferred an unfair advantage on Huffman and resulted in injury to MBFA's creditors. The court said:
 
 
 21
 Huffman received the scheduled payments on the $74,007.00 note through the August 1980 payment, only two months prior to the filing of the bankruptcy petition. During the first eight months of 1980 the debtor's payments to other creditors ranged from four months to six months in arrears. Those payments were made to Huffman without fail while utilities, withholding taxes on employee's wages, social security on employees, suppliers of food and other creditors who furnished services or goods were paid nothing. Clearly those payments conferred an unfair advantage on Huffman and, to the extent that monies were being paid to him which otherwise would have been available to payment to creditors, it resulted in injury to those creditors.
 
 
 22
 Id. Thus, finding the second prong of the Mobile Steel test satisfied, the court moved on to consider whether subordination of Huffman's claim would be inconsistent with the provisions of the Bankruptcy Code.
 
 
 23
 The court determined that the third element of the Mobile Steel test was met, finding that because Huffman was paid when other creditors were not paid, the "concept of fair and equitable distribution" that the court saw as a fundamental concept of the Bankruptcy Code was violated. Id. Thus, reasoned the court, equitable subordination of Huffman's claim was not inconsistent with the provisions of the Bankruptcy Code.
 
 
 24
 In summary, the court stated that it "found no overt acts of inequitable conduct on the part of Huffman but ... concluded that the inequitable conduct on the part of Wall, involving the Dumas home transaction and the Crestview home transaction, should be imputed to Huffman." Id. (emphasis in original). Therefore, concluded the court, "the trustee has overcome the presumption of validity which attaches to Huffman's claim. Huffman's evidence and argument attempting to prove his good faith and fairness in the dealings are not persuasive." Id.
 
 
 25
 On appeal, the district court affirmed the decision of the bankruptcy court. The district court found "no abuse of discretion" in the bankruptcy court's rulings. Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.), No. CA-5-85-62, slip op. at 5 (N.D.Tex. Feb. 7, 1986). The court was persuaded that the bankruptcy court had complied with the mandate of the Fifth Circuit and that the trustee had put forth a substantial factual basis to support its allegations of impropriety. The court said that in the fact situation presented by this case--"Wall's insider relationship with MBFA, his partnership with [Huffman], and his inequitable conduct in the Dumas and Crestview homes transactions"--the bankruptcy court's imputation of Wall's inequitable conduct to Huffman was not "clearly erroneous." Id. This appeal followed.
 
 II.
 
 26
 In his second appeal to this court, Huffman raises several arguments. First, Huffman attacks the "imputation" to Huffman of Wall's alleged inequitable conduct. Huffman contends that because the bankruptcy court found that Huffman committed no overt acts of misconduct, the bankruptcy court's decision is wrong as a matter of law. Huffman argues that because he had no control over MBFA and no special insight into the workings of the debtor corporation, it was wrong for the bankruptcy court to impute Wall's alleged inequitable conduct to Huffman. In this regard, Huffman distinguishes between simple insiders and insiders who are fiduciaries, arguing that insider status alone is an insufficient ground for subjecting an insider's claim to the same severity of scrutiny as the claim of an insider creditor who is active in the management of the corporation. Huffman alleges that the bankruptcy court should have dealt with his claim as if he was an outsider because he was not a fiduciary of MBFA.
 
 
 27
 Second, Huffman argues that the bankruptcy court erred in finding that Wall committed inequitable conduct. To begin, in attacking the bankruptcy court's conclusion that Wall acted inequitably, Huffman points out that the court, in stating that it was wrong for Wall to deal with MBFA at all regardless of whether MBFA profited, misstated Texas law. Huffman contends that the full disclosure required by Texas law when a fiduciary deals with his corporation was made in this case, pointing to the minutes of the MBFA Board meeting. Hence, since the transaction was not itself illegal, Wall's conduct could not be considered inequitable for reason of being illegal. Therefore, Huffman takes the further step of arguing that the transaction giving rise to his claim resulted in a benefit to MBFA, setting forth his view of the financial circumstances surrounding the transactions and of the testimony relevant to that issue. In summary, Huffman argues that MBFA benefitted from the Dumas and Crestview transactions and thus, Wall cannot be said to have acted inequitably. Hence, since there is no inequitable conduct to impute to Huffman, subordination of Huffman's claim was improper.
 
 
 28
 Third, Huffman argues that even if the bankruptcy court was correct in subordinating his claim, the court erred in subordinating his claim further than the extent necessary to offset the alleged harm the creditors suffered, thereby violating a principle enunciated in Mobile Steel. Huffman argues that the only injury or unfair advantage recognized by the bankruptcy court was the making of eight months of payments to Huffman on the $74,007 note at a time when payments to other creditors were four to six months in arrears. Huffman contends that the injury, then, would be just $15,817.60 (monthly installment of $1,078.76 on the $88,860 note plus monthly installment of $898.44 on the $74,007 note multiplied by eight). Therefore, if subordination was proper, the claim could be subordinated only to the extent of $15,817.60.
 
 
 29
 Fourth, with respect to the eight months of payments made immediately prior to the filing of the bankruptcy petition, Huffman argues that such payments would constitute preferential payments for which a specific legal remedy is provided in 11 U.S.C. Sec. 547(b). Because equitable subordination is a creation of equity, Huffman argues, the adequate remedy at law provided in section 547 preempts equitable subordination under 11 U.S.C. Sec. 510(c).
 
 
 30
 Finally, simply to cast doubt on any inference that Huffman thought the claim under either the $74,007 note or the $88,860 note was in bad faith which might arise from the bankruptcy court's finding that the payments made to Huffman by MBFA were made only under the $74,007 note, Huffman argues that the court's finding was inaccurate. According to Huffman, the payments were made under both notes.
 
 III.
 A. Standard of Review
 
 31
 It is well-established that a bankruptcy court has the authority to subordinate a claim on equitable grounds. See, e.g., Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281, 289 (1939); Multiponics, 622 F.2d at 713; Mobile Steel, 563 F.2d at 698-702. "A Court's conclusions of law are freely reviewable on appeal. As to all findings of fact, however, a reviewing court of a bankruptcy decision must accept the findings as found, unless they are clearly erroneous." Multiponics, 622 F.2d at 713 (citations omitted). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). Strict application of the clearly erroneous rule is particularly important where the district court has affirmed the bankruptcy court's findings. Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.), 712 F.2d 206, 209 (5th Cir.1983). "When a finding of fact is premised on an improper legal standard, or a proper one improperly applied, that finding loses the insulation of the clearly erroneous rule." Id. (citing Smith v. Hightower, 693 F.2d 359 (5th Cir.1982)).
 
 B. General Legal Principles
 
 32
 Section 510(c) of the Bankruptcy Code provides, in relevant part, that:
 
 
 33
 (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--
 
 
 34
 (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.
 
 
 35
 11 U.S.C. Sec. 510(c). The section permits the bankruptcy court, in the exercise of its equitable jurisdiction, to apply pre-Code principles of equitable subordination. Missionary Baptist, 712 F.2d at 211.[5]
 
 
 36
 Three general categories of conduct considered sufficient to warrant equitable subordination have been recognized by the courts: (1) fraud, illegality, breach of fiduciary duty; (2) undercapitalization; and (3) the claimant's use of the debtor as a mere instrumentality or alter ego. Id. at 212. This court has adopted a three-pronged test for equitable subordination of claims in bankruptcy. In Mobile Steel we said that three conditions must be satisfied before the exercise of the court's power of equitable subordination is appropriate:
 
 
 37
 (i) The claimant must have engaged in some type of inequitable conduct.
 
 
 38
 (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
 
 
 39
 (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].
 
 
 40
 Mobile Steel, 563 F.2d at 700 (citations omitted); accord Multiponics, 622 F.2d at 713. This formula was not a novel statement but rather, was arrived at through a "distillation of case law." Collier's p 510.05 at 510-9.
 
 
 41
 In Mobile Steel, we noted that in determining whether the three conditions were satisfied, three principles should be kept in mind. First, inequitable conduct directed against the debtor or its creditors may be sufficient to warrant the subordination of the claim irrespective of whether the conduct was related to the acquisition or assertion of that claim. Mobile Steel, 563 F.2d at 700. But see, e.g., Stebbins v. Crocker Citizens Nat'l Bank (In re Ahlswede), 516 F.2d 784, 788 (9th Cir.), cert. denied, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975).
 
 
 42
 Second, "claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." Id. at 701. In illustration, we pointed out that "if a claimant guilty of misconduct asserts two claims, each worth $10,000, and the injury he inflicted on the bankrupt or its creditors amounted to $10,000, only one of his claims should be subordinated." Id. This is due to the fact that the exercise of the subordination power is governed by equitable principles and equitable relief is remedial, not penal. Id.
 
 
 43
 Third, with respect to the allocation of the burden of proof, a claim filed under section 501 of the Bankruptcy Code enjoys prima facie validity which may be overcome by the trustee's presentation of evidence. See Missionary Baptist, 712 F.2d at 212. "[A]n objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegation of impropriety."[6] Mobile Steel, 563 F.2d at 701. A claim arising from the dealings between a debtor and its fiduciaries is to be rigorously scrutinized by the courts, but the mere fact of the fiduciary relationship is insufficient to warrant subordination. See, e.g., Missionary Baptist, 712 F.2d at 212 (citing Mobile Steel and Multiponics).[7] "Upon the trustee's submission of sufficient evidence to overcome the prima facie showing, the claimant is obliged to prove his good faith and fairness in the dealings. It is at this juncture that the fiduciary's claim is subject to the probing light of judicial inquiry." Missionary Baptist, 712 F.2d at 212; see Mobile Steel, 563 F.2d at 701-02. As this court stated on another occasion, "[t]his proof allocation provides a proper balance of burdens, assuring that the trustee does not underprove his objections while, at the same time, assuring that the fiduciary need not overprove his good faith and fairness at the mere cry of inequity by the trustee." Multiponics, 622 F.2d at 714.
 
 IV.
 
 44
 This case was remanded to the bankruptcy court for the purpose of having that court set forth its findings and conclusions under the three-part test set out in Mobile Steel because without those findings and conclusions, the panel of this court hearing the appeal was unable to conclude that the trustee had discharged his burden of proof under Mobile Steel. Our review of the opinion rendered by the bankruptcy court on remand leaves us no better able to draw that conclusion. As a result, we find ourselves unable to affirm the court's decision, affirmed by the district court, to subordinate Huffman's claim and conclude that, once again, this case must be remanded to the bankruptcy court so that the bankruptcy court can set forth additional findings and conclusions. In order to assist the bankruptcy court in its disposition of this case on remand, we will at this juncture discuss the concerns we have about the opinion rendered by the bankruptcy court after the first remand in this case.
 
 A.
 
 45
 This case is unlike most equitable subordination cases in that the claimant in this case is not the officer/director/controlling shareholder of the debtor (i.e. as is Wall) but rather, is the controlling person's partner/business associate. When this case came to this court for the first time, a panel of this court affirmed the fact-finding that Huffman is an insider of the debtor under the Bankruptcy Code's definition. In its opinion on remand, the bankruptcy court states several times that because Huffman is an insider under the statute, he is a fiduciary of MBFA, citing no authority for that proposition. We are not persuaded that the fact that one is deemed an "insider" under the Bankruptcy Code necessarily means that one is a fiduciary. Our concern about the correctness of the bankruptcy court's conclusion in this regard is fueled by cases and commentary that suggest that one can be an insider without being a fiduciary.[8]
 
 
 46
 Our concern about the bankruptcy court's assertion that Huffman is a fiduciary of MBFA by virtue of his status as an insider is somewhat assuaged by our recognition that any belief on the part of the bankruptcy judge that Huffman was a fiduciary did not form the basis for the court's decision to subordinate Huffman's claim. Any fiduciary relationship that might exist between Huffman and MBFA by virtue of the statutory relationship was apparently not the basis for the bankruptcy court's analysis and disposition of this case. Indeed, the court looked to the only category of conduct that it believed might apply--fraud, illegality, or breach of fiduciary duty--and found no overt acts of misconduct by Huffman. Additionally, the court made a finding that Huffman was not a director, officer or employee of MBFA and that the statutory relationship as an insider was his sole contact with MBFA. Therefore, the court concluded that it would have to look to whether or not Wall committed inequitable conduct that could be imputed to Huffman. The breach of fiduciary duty that the court focused on is the breach of Wall's duty to MBFA, a duty which clearly exists since Wall is an officer, director, and controller of MBFA.
 
 
 47
 While we do not believe that the bankruptcy court's questionable conclusion that Huffman was a fiduciary served to undermine the court's decision, we find the inquiry conducted by the bankruptcy court regarding whether Wall committed inequitable conduct to be fatally flawed. With respect to the question of whether Wall committed inequitable conduct, the bankruptcy court made several fact-findings regarding the Dumas and Crestview transactions being "bad deals" for MBFA: (1) Wall caused the two homes to be sold to MBFA for considerably more consideration than that received by MBFA when it subsequently sold them; (2) the price received by Wall and Huffman in the package exceeded the fair value of the property interests conveyed by them to MBFA; and (3) the price received by MBFA when it sold the homes was substantially less than the price at which Wall and Huffman sold the homes to MBFA. See Missionary Baptist, 48 B.R. at 889-90.
 
 
 48
 While fact-findings are insulated by the clearly erroneous rule, it can be argued that these findings should lose the clearly erroneous protection because of a clear misstatement of Texas law made by the bankruptcy court in discussing Wall's conduct. See discussion supra at III(A). In the midst of his discussion about whether Wall committed inequitable conduct, the bankruptcy judge stated, without citation of authority, that an insider is prohibited from dealing with his corporation, regardless of whether the transaction is beneficial to the corporation. It is important to recognize that the erroneous legal conclusion was immediately followed by a statement that can be read as an assertion by the court that even without the alleged prohibition against dealing, Wall still can be said to have acted inequitably since the price received by MBFA when it sold the homes was substantially less than the price at which Huffman and Wall sold the homes to MBFA. The problem is, however, that the "separateness" of the erroneous legal conclusion and the fact-findings is thrown into question by the court's disposition of Huffman's explanations as to why the transactions were beneficial to MBFA and why Huffman should be seen as acting in good faith. It seems to us that one could fairly read the court's disposition as being influenced, at least in part, by the notion that the transactions were prohibited, that is, were per se bad.
 
 
 49
 To summarize, we are unable to discern the extent to which, if any, the bankruptcy court's findings that the Dumas and Crestview transactions were "bad deals" for MBFA were "infected" by the court's erroneous conclusion that insiders are prohibited from dealing with their corporations, regardless of whether the transaction is beneficial to the corporation. Being so unable, we cannot determine whether the trustee met his burden of proof. Therefore, we must remand the case so that the bankruptcy court can consider, without the influence of the erroneous legal conclusion, whether Wall committed inequitable conduct satisfying the first prong of the Mobile Steel test.
 
 
 50
 In that regard, we note that in the peculiar facts of this case, that is, with Huffman being intimately connected with the transactions that gave rise to the notes subordinated by the bankruptcy court, we can say that, if the bankruptcy court on remand finds that Wall committed inequitable conduct within the meaning of Mobile Steel, Huffman could be subordinated on the basis of that conduct, notwithstanding the court's finding that Huffman himself committed no overt acts of misconduct. The notes that grew out of the Dumas and Crestview transactions and that now form the basis of Huffman's claim against the debtor were issued by MBFA for transactions between MBFA and entities in which Huffman was a principal--the Huffman and Wall partnership in which Huffman was a general partner and West Texas Homes in which Huffman was a fifty percent owner of the capital stock. The $74,007 note, growing out of the package sale of the two homes, was payable to Huffman individually as a general partner in the Huffman and Wall partnership. The $88,860 note, arising from the assignment of the management contracts to MBFA, although not made payable to Huffman individually, was made payable to an entity in which Huffman was a principal and was subsequently endorsed over to Huffman. Huffman's connection to Wall and his involvement in the transactions that form the basis of his claim against the debtor allow us to conclude that subordination of Huffman's claim could be supported on the basis of identifiable inequitable conduct on Wall's part.[9] In saying this, we do not express an opinion on a hypothetical case in which a note is in some way passed by an inequitable actor to an innocent, uninvolved bystander. In that hypothetical situation, one which is not presented in this case, there might be reasons to find that subordination of a note would be contrary to the principles of equitable subordination as they have developed in the courts.
 
 B.
 
 51
 As Huffman correctly points out in his brief to this court, a claim should not be subordinated beyond the extent necessary to offset any harm. See, e.g., Mobile Steel, 563 F.2d at 701. Huffman contends that the bankruptcy court, in discussing the harm prong of the Mobile Steel test, identified the harm and unfair advantage as being the fact that eight months of payments were made to Huffman at a time when payments to other creditors were four to six months in arrears. Therefore, Huffman argues, the harm or unfair advantage is easily calculated ($15,817.60) and the remainder of his claim ($103,187.40) should not have been subordinated. Further, Huffman argues, these payments could have been remedied through the use of the preference provision of the Bankruptcy Code, 11 U.S.C. Sec. 547(b), and thus, since an adequate remedy at law exists, equitable subordination was improper.
 
 
 52
 It is true that in its analysis of the second prong of the Mobile Steel test, the bankruptcy court focused exclusively on the fact that payments were made to Huffman at a time when other creditors were not being paid. This focus in the opinion certainly forms a basis for the allegation that subordination of the claim was improper because the payments to Huffman were preferences under the Code for which an adequate remedy at law exists. The opinion, taken as a whole, however, leaves us far from certain that the bankruptcy court believed that the misconduct, and thereby, the harm or unfair advantage, was merely in the making of the payments. We read the bankruptcy court as saying different, and somewhat inconsistent, things at various times in its opinion. At points in its opinion, the court seems to be saying that the transactions never should have been entered into, regardless of the price. At other points, the court's statements can be read to mean that the problem is simply that MBFA paid too much in the transactions, not necessarily that the transactions should not have been entered into at any price. Finally, through other references in its opinion, the court seems to characterize the problem as being the fact that payments were made to Huffman on his notes when other creditors were not being paid.
 
 
 53
 If the court saw the misconduct and, thereby, the harm, as simply the payments made during the eight months before the bankruptcy filing, then subordination was arguably improper to the extent that 11 U.S.C. Sec. 547 provides an adequate remedy at law. See, e.g., Note, Equitable Subordination and Analogous Theories of Lender Liability: Toward a New Model of "Control," 65 Tex.L.Rev. 801, 813 (1987) (commenting that "[t]he application of equitable subordination ... is troubling when the Bankruptcy Code provides an appropriate alternative remedy for the harm ... [I]f the challenged claim can be treated under the traditional voiding powers of the trustee, invoking equitable subordination to go beyond statutorily provided remedies seems unnecessary" ; but noting that "[n]evertheless, some courts have ordered subordination even though a claim was voidable as a preference or a fraudulent conveyance.") (footnotes omitted); cf. Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 86 (1961) ("Equitable jurisdiction should not be exercised when there is a full, adequate and complete remedy at law."). We do not decide in this appeal whether the availability of the preference remedy preempts the use of equitable subordination. Rather, we simply recognize the existence of that question as one that the bankruptcy court should address if, on remand, the payments are somehow deemed pivotal by the bankruptcy court. That court should, in the first instance, make the determination.
 
 
 54
 If the inequitable conduct was the transaction itself such that the transaction should never have been entered into, then subordination of the entire note might be appropriate, depending, of course, upon the bankruptcy court's assessment of what harm or unfair advantage was caused by entering into the transaction. If, however, the transaction itself was not bad, but rather, the price extracted from MBFA was simply too high, subordination of some part of the claim, but not the entire claim, would seem appropriate. However, "if the injury to creditors cannot be quantified without undue complication, the court need not conduct extensive proceedings to quantify the harm and can subordinate the entire claim, not simply a portion of it." DeNatale & Abram, The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors, 40 Bus.Law. 417, 427 (1985) (citing Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); Trone v. Smith (In re Westgate-California Corp.), 642 F.2d 1174, 1178 (9th Cir.1981); In re Automatic Washer Co., 226 F.Supp. 834, 836 (S.D.Iowa), aff'd, 338 F.2d 1006 (8th Cir.1964)).
 
 
 55
 The problem we face in reviewing the decision to subordinate the entire claim made by Huffman against MBFA lies in the fact that we are unable to determine the rationale underlying that decision. Because the court, in analyzing the second prong of the Mobile Steel test, discussed only the payments, we cannot dismiss out-of-hand the argument that subordination of the entire claim was improper. On the other hand, we find enough suggestions in the opinion of the bankruptcy court to cast doubt on the assertion that the harm and unfair advantage seen by the court was only in the payments made on the notes. Therefore, we believe that identification by the bankruptcy court of the inequitable conduct and the extent, if any, to which that conduct resulted in harm or unfair advantage is necessary.
 
 V.
 
 56
 On the basis of the foregoing, the judgment of the district court affirming the judgment of the bankruptcy court is REVERSED and the case is REMANDED to the bankruptcy court for proceedings consistent with this opinion.
 
 
 
 [1]
 The bankruptcy court, in its opinion dated February 25, 1985, noted that no dissolution papers were filed with the proper state official. However, the ownership of the note by Huffman was accepted by the bankruptcy court. The bankruptcy court noted that although the proper corporate procedures did not appear to have been followed in making the "transfer," no challenge to Huffman's "ownership" of the note was advanced by the trustee and thus, for purposes of the opinion, the court would assume that Huffman owned the note. Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.), 48 B.R. 885, 887 n. 2 (Bankr.N.D.Tex.1985)
 
 
 [2]
 In the bankruptcy court's February 25, 1985 opinion, the court found that payments were made to Huffman only under the $74,007 note. Huffman disputes that finding in this appeal. See discussion infra at II
 
 
 [3]
 The court found unpersuasive the trustee's argument with respect to inequitable conduct on the part of Huffman that subordination was proper because Huffman had no financial exposure in the two transactions, Huffman paid no money for an interest in the Dumas home, Huffman "was the beneficiary of Wall's munificence in acquisition of an equal share of the proceeds of sale of the Crestview home," and Huffman was enriched by the two transactions. Missionary Baptist, 48 B.R. at 888. While finding those arguments to be factually correct, the court found that "[s]omething more than those transactions alleged by the trustee is required before Huffman's debts properly can be subordinated." Id. This conclusion was apparently based on the bankruptcy court's reading of this court's first opinion in this case to require more for subordination under section 510(c), relying on the following language from that opinion:
 Whether or not Huffman's insider status, coupled with his receipt of the fruits of Wall's manipulations, is tantamount to the unfairness, bad faith or unconscionable wielding of control for personal gain envisioned by Mobile and Multiponics is problematical, in light of our holding that "an objection on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegations of impropriety." Matter of Mobile Steel Co., 563 F.2d at 701.
 Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.), 712 F.2d 206, 212-13 (5th Cir.1983) (quoted in Missionary Baptist, 48 B.R. at 888-89).
 
 
 [4]
 The court noted that, had it been considering a claim by Wall, it would have considered the full scope of his dealings with MBFA and would quickly conclude that the elements of the Mobile Steel test were met. Missionary Baptist, 48 B.R. at 889. However, with respect to Huffman, the court noted that notwithstanding the fact that Huffman was, by definition, an insider of MBFA, he was an insider only in connection with the transactions involving the Dumas and Crestview homes. "As insider with Wall any inequitable conduct on the part of Wall in connection with the transactions involving those two homes only should be imputed to Huffman." Id. (emphasis added)
 
 
 [5]
 This section had no parallel under the former Bankruptcy Act. The section gives statutory authority for the subordination of claims. Section 510(c)(1) "is broad in scope and encompasses the case law developed by the courts under the general grant of equitable jurisdiction under the Act." 3 Collier on Bankruptcy p 510.01 at 510-2-510-3 (15th ed. 1987) [hereinafter cited as "Collier's"]. The subsection "provides for the subordination of claims that are otherwise allowable when principles of equity would be offended by the allowance of such claims on a parity with those of other creditors." Id. at 510-3. The subsection codifies prior case law. Id
 Under the Act, there was no specific provision which expressly authorized subordination of a creditor's claim. However, the courts found authorization under the Act to exercise the equitable power of subordination under sections 2a and 57k which granted general equitable jurisdiction to the bankruptcy courts. See Collier's p 510.01 at 510-3; see also Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Bostian v. Schapiro (In re Kansas City Journal-Post Co.), 144 F.2d 791, 800 (8th Cir.1944). The principles developed by the courts prior to the enactment of the Bankruptcy Code continue to be of importance because section 510(c), rather than specifying the criteria to be used by the courts in subordinating claims, directs that courts are to be governed by the principles of equitable subordination, those having been developed by the courts. See Collier's p 510.01 at 510-3-510-4.
 
 
 [6]
 In explaining why the challenge to the dealings between fiduciaries and their corporations must contain substantial factual basis to support the allegation of impropriety, we said that:
 Absent such a requirement, the wide-ranging inquiry authorized by [Bostian v. Schapiro (In re Kansas City Journal-Post Co.), 144 F.2d 791 (8th Cir.1944) ] would place an unwarranted burden on fiduciaries by requiring them to prove the good faith and fairness of every one of their actions with respect to their corporation at the pleasure of the Trustee. This would be tantamount to the adoption of a rule that claims advanced by fiduciaries are invalid simply because of the nature of the relation existing between the claimant and the bankrupt. For reasons that should be obvious--among them, a desire not to discourage those most interested in a corporation from attempting to salvage it through an infusion of capital--we have steadfastly refused to endorse such a principle.
 Mobile Steel, 563 F.2d at 701 (citing Spach v. Bryant, 309 F.2d 886, 889 (5th Cir.1962); Arnold v. Phillips, 117 F.2d 497, 503 (5th Cir.), cert. denied, 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539 (1941); Wood v. Richmond (In re Branding Iron Steak House), 536 F.2d 299, 301 (9th Cir.1976); Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 102 (1961)).
 
 
 [7]
 In this regard, it is instructive to note that the drafters of the Bankruptcy Code considered partially codifying the grounds for subordination, with section 4-406(a)(2) of an earlier draft directing that the claims of an officer, director or affiliate of the debtor be subordinated as a matter of law. See Collier's p 510.05 at 510-10 (discussing H.R. 31, 95th Cong., 1st Sess. (1975)). However, this provision was deleted in the Code as enacted, with section 510(c) providing for subordination on equitable, rather than on statutorily-defined grounds. See Collier's p 510.05 at 510-10
 
 
 [8]
 For example, perhaps the best-known treatise on bankruptcy law opines:
 Regardless of the nature of the claimant's relationship with the debtor, equitable subordination is not justified in the absence of some inequitable conduct. The reason that the transactions of insiders will be closely studied is because such parties usually have greater opportunities for such inequitable conduct, not because the relationship itself is somehow a ground for subordination. If the alter ego or insider has fiduciary responsibilities to other creditors, then claims that might otherwise be allowable as proved may perhaps be subordinated. But if the insider claimant has no fiduciary responsibilities, his claims, while closely scrutinized, should only be subject to subordination on grounds that would apply equally to outsiders.
 Collier's p 510.05[a] at 510-14. But cf. In re Beverages Int'l Ltd., 50 B.R. 273, 280 (Bankr.D.Mass.1985) (stating that "[w]here a claimant is an insider or an affiliate of the debtor, or where the creditor exercises control over or domination of the debtor, his dealings with the debtor are subject to strict scrutiny.") (emphasis added).
 In this regard, we note that a reading of the prior panel opinion in this case might allow the inference that the prior panel believed that Huffman was, indeed, a fiduciary of MBFA. See Missionary Baptist, 712 F.2d at 212 n. 4. We believe, however, that a fair reading of that opinion does not support a conclusion that the panel considered or decided that question. Since, as we point out infra, such a determination did not form the basis of the bankruptcy court's disposition of this case on remand, we need not decide the question whether insider status under the Code necessarily implies the existence of fiduciary responsibility or whether Huffman, for some reason other than his statutorily-defined status as an insider, is a fiduciary.
 
 
 [9]
 We note that the bankruptcy court, on remand, limited itself to consideration of Wall's conduct that related to the transactions involving the Dumas and Crestview homes. The court noted that "while the full scope of Wall's dealings could be considered in making the subordination determination those dealings by Wall cannot be imputed to Huffman." Missionary Baptist, 48 B.R. at 889. With regard to any claim by Wall, the court noted that it would not be necessary to limit the determination of inequitable conduct to the Dumas and Crestview transactions because this court in Mobile Steel stated that inequitable conduct directed against the debtor or its creditors may be sufficient to warrant subordination of a claim even if that conduct was not related to the acquisition or assertion of that claim. Id. n. 4 (citing Mobile Steel, 563 F.2d at 700). The bankruptcy court believed that it could not consider the full scope of Wall's dealings in deciding the subordination question raised by Huffman's claim because, "[n]otwithstanding the fact that Huffman by definition is an insider of the debtor he was an 'insider' only in connection with the Dumas home transaction and the Crestview home transaction. As insider with Wall any inequitable conduct on the part of Wall in connection with the transactions involving those two homes only should be imputed to Huffman." Id. at 889
 Because the bankruptcy court's decision to limit itself to consideration of Wall's conduct relating only to the Dumas and Crestview transactions is not challenged in this appeal, we express no opinion on whether that limitation was, in fact, required and, for purposes of this opinion, we proceed under the same limitation imposed by the bankruptcy court.