United States Court of Appeals,

Fifth Circuit.

No. 92-1703.

In the Matter of HERBY'S FOODS, INC., Debtor.

SUMMIT COFFEE COMPANY, et al., Appellants,

v.

HERBY'S FOODS, INC., Appellee.

Sept. 20, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before POLITZ, Chief Judge, REYNALDO G. GARZA and JOLLY, Circuit Judges.

POLITZ, Chief Judge:

We review the propriety of a bankruptcy court's equitable subordination of certain creditors' claims to a level equivalent to that of equity stockholders. Finding no infirmity in the bankruptcy court's rulings or in the upholding thereof by the district court, we affirm.

*Background*

Herby's Foods, Inc. produced and distributed fast foods to convenience stores. The Summit Coffee Company, Inc., Dunnam-Snyder Company, and The Snyder Company, Inc. (collectively, the Insiders) are interrelated companies that advanced funds to Herby's and possess claims as unsecured creditors in the Herby's bankruptcy.

The corporate "food chain" was as follows: (1) Herby's was a wholly owned subsidiary of Summit; (2) all of the voting securities of Summit were owned by Dunnam; (3) Dunnam is a partnership composed of seven trusts for the benefit of William Snyder's ex-wife and children; and (4) the managing agent for Dunnam at the time of Summit's acquisition of Herby's was Snyder Co., owned by William Snyder's ex-wife and children. In addition to the commonality of ownership interests, these companies enjoyed a commonality of management. At various times, William Snyder personally held several management positions, including president of Snyder Co., managing agent of Dunnam, an officer of Summit, and president of Herby's. The Insiders stipulated that they are

"insiders" of Herby's as defined in the Bankruptcy Code.[1]

Summit purchased Herby's on October 26, 1987 pursuant to a Stock Purchase Agreement.[2] The purchase price was $5,500,000, $2,800,000 of which was actually a loan to Herby's to pay off an intercompany debt to its previous owner. Herby's executed a note and security agreement in favor of Summit for $2,800,000. Like the Stock Purchase Agreement, these documents were dated October 26, 1987; the security interest, however, was not perfected at that time.

In addition, Dunnam provided a working capital line of credit to Herby's in the amount of $4,000,000. The parties have stipulated that no third-party lender would make a working capital loan to Herby's on any terms. The line of credit was evidenced by Herby's promissory note and security agreement, both dated October 26, 1987. Once again, the security interest was not timely perfected. Through a series of draws, Herby's eventually borrowed the maximum amount available under this line of credit.

Summit did not file a UCC-1 to perfect its security interest under the purchase money loan until November 10, 1988, 13 months after the note and security agreement had been executed. Similarly, Dunnam did not file a UCC-1 to perfect its security interest under the working capital loan until June 9, 1989, 20 months after the date of the underlying note and security agreement. According to Snyder, both of these security agreements covered "basically everything" owned by Herby's. Snyder also admitted that, "[w]e delayed putting in the UCC's because we were hoping to get a secured lender."

Between Summit's acquisition of Herby's and the filing of its petition in bankruptcy on September 7, 1989, the amount that Herby's owed to its unsecured creditors (other than the Insiders) increased fivefold, from $929,550.23 to $4,635,675. Further, between January 6, 1989 and September 1, 1989, Snyder Co. made unsecured advances to Herby's exceeding $579,000, advances which were not evidenced by loan agreements or any other documentation and which apparently bore

---

[1]*See* 11 U.S.C. § 101(31).

[2]As no bank would finance Summit's acquisition of Herby's on terms that were acceptable to the Insiders, Summit borrowed the funds from Dunnam.

no interest.

After Herby's filed its voluntary Chapter 11 bankruptcy petition, the Insiders, as unsecured creditors, submitted these proofs of claims:

> Summit      $3,086,394.52

> Dunnam      $4,054,696.12

> Snyder Co.      $ 579,276.47

The Official Unsecured Creditors Committee (the Committee) responded with a Complaint to Subordinate Claims, Avoid Liens and Object to Claims. In its complaint the Committee sought to subordinate and object to the claims of the Insiders and to avoid the liens of Summit and Dunnam. Neither Summit nor Dunnam asserted liens, nor did they oppose their avoidance, apparently in recognition of their avoidability under 11 U.S.C. § 547. The Insiders opposed the avoidance of their claims and, alternatively their subordination to a level below that of general unsecured creditors.

The bankruptcy court applied the test for equitable subordination which we detailed in *In re Mobile Steel Co.*[3] Under that test, equitable subordinatio n is justified only if: (1) the claimant engaged in inequitable conduct; (2) the misconduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim would not be inconsistent with the provisions of the Bankruptcy Act (now Bankruptcy Code).[4] The bankruptcy court found in the affirmative on each of the three *Mobile Steel* inquiries and subordinated the claims of the Insiders to the level of equity holders, finding that this ranking was necessary to offset the harm that the debtor and its non-insider creditors had suffered as a result of the inequitable conduct of the Insiders. 134 B.R. 207 (Bkrtcy.N.D.Tex.1991).

Timely appealing the affirmance by the district court, the Insiders assert five points of error: (1) the finding that Herby's was undercapitalized on the date of Summit's acquisition; (2) the finding

---

[3]*Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977).

[4]*Id.* at 699-700.

that the late perfection by Summit and Dunnam of their security interests constituted inequitable conduct;  (3) the characterization of the sums advanced to Herby's by Summit, Dunnam, and Snyder Co. as equity contributions rather than loans;  (4) the finding that the Insiders' actions harmed the other creditors sufficiently to warrant subordination;  and (5) the affirmance of the extent of the equitable subordination ordered by the bankruptcy court.

*Analysis*

A. Standard of Review

Bankruptcy Rule 8013 provides that on appeal, "[f]indings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."[5]  The clearly erroneous rule should be strictly applied if the district court has affirmed the bankruptcy court's findings.[6]  The bankruptcy court's conclusions of law, however, are reviewed *de novo.*[7]

B. Principles of Equitable Subordination

The Bankruptcy Code provides that the bankruptcy court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all of part of an allowed interest to all or part of another allowed interest."[8]  The legislative history of this provision reflects that Congress "intended that the term "principles of equitable subordination' follow existing case law and leave to the courts development of this principle."[9]  The equitable powers of a bankruptcy court, including the power to subordinate, may be "invoked to the end that fraud will not prevail, that substance will not give way to form, that

---

[5]*See also Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.),* 926 F.2d 1458, 1464 (5th Cir.1991).

[6]*Id.;  Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.),* 712 F.2d 206, 209 (5th Cir.1983) *(Missionary Baptist I).*

[7]*In re Fabricators, Inc.,* 926 F.2d at 1464;  *In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1252 (5th Cir.1986).

[8]11 U.S.C. § 510(c)(1).

[9]124 Cong.Rec.H 11095, H 11113 (Sept. 28, 1978).

technical considerations will not prevent substantial justice from being done."[10]

In *Mobile Steel* we established the test to determine when equitable subordination is appropriate. In addition to the tripartite test noted above, we further held in *Mobile Steel* that three additional principles must be considered in determining whether the three prongs of the subordination test have been satisfied. First, the inequitable conduct by the claimant may be sufficient to warrant subordination whether or not the misconduct related to the acquisition or assertion of the claim. Second, a claim should be subordinated only to the extent necessary to offset the harm that the bankrupt and its creditors suffered as a result of the inequitable conduct. Third, the claims arising from the dealings between the debtor and its fiduciaries must be subjected to rigorous scrutiny, and, if sufficiently challenged, the burden shifts to the fiduciary to prove both the good faith of the transaction and its inherent fairness.[11]

Subsequent to *Mobile Steel,* we expanded the class of claims that are subject to rigorous scrutiny to include insider claims.[12] Additionally, if the claimant is an insider, less egregious conduct may support equitable subordination.[13] The determination of insider status is a question of fact subject to the clearly erroneous standard of review.[14]

Although the exact parameters of inequitable conduct have not been comprehensively or precisely delineated, such conduct does encompass: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) the claimant's use of the debtor corporation as a mere instrumentality or alter ego.[15]

Undercapitalization generally refers to the insufficiency of capital contributions made to the

---

[10]*Pepper v. Litton,* 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939).

[11]*Mobile Steel,* 563 F.2d at 700-701; *Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.),* 818 F.2d 1135, 1143-44 (5th Cir.1987) *(Missionary Baptist II).*

[12]*Fabricators,* 926 F.2d at 1465; *see also Pepper,* 308 U.S. at 306, 60 S.Ct. at 244 (subjecting fiduciaries of the debtor to rigorous scrutiny).

[13]*Fabricators,* 926 F.2d at 1465; *see also Pepper,* 308 U.S. at 306, 60 S.Ct. at 244.

[14]*Fabricators,* 926 F.2d at 1466; *Missionary Baptist I,* 712 F.2d at 210.

[15]*Fabricators,* 926 F.2d at 1467; *Missionary Baptist I,* 712 F.2d at 212.

debtor corporation. Inadequate capitalization may be established by the testimony of a skilled financial analyst that the capitalization "would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized."[16] Capitalization is also inadequate "if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source."[17]

Even though undercapitalization alone generally does not justify equitable subordination, evidence of additional inequitable conduct may do so. For example, if an insider makes a loan to an undercapitalized corporation, the combination of undercapitalization and the insider loan may allow the bankruptcy court to recharacterize the loan as a capital contribution,[18] or to equitably subordinate the loan to the claims of other creditors.[19]

C. Equitable Subordination of Appellants' Claims

1. Undercapitalization

The record contains evidence to support the finding that Herby's was undercapitalized on the date of Summit's purchase. An expert financial witness tendered by the Committee testified that as of the date of its acquisition by Summit, Herby's capital was not sufficient to support its operations. The testimony of a former financial officer of Herby's corroborated the fact that on the date of its acquisition, Herby's was incapable of paying its debts as they became due and therefore was insolvent. William Snyder conceded that Herby's was insolvent on the date of acquisition.

We need not rely solely on the first prong of the *Mobile Steel* test for inadequate capitalization, however. The Insiders stipulated before trial that:

> Prior to the closing, Snyder [Co.] on behalf of Dunnam, solicited certain financial institutions seeking a loan to complete the acquisition. No independent third-party lender, after reviewing the financial position of the Debtor and Summit, would lend Dunnam or the Debtor money secured by the assets of the debtor on terms acceptable to the Insider Claimants. Indeed, only one lender offered financing but it required personal guarantees.... The Debtor was not able

---

[16]*Mobile Steel,* 563 F.2d at 703.

[17]*Id.*

[18]*Pepper,* 308 U.S. at 309-10, 60 S.Ct. at 246-47.

[19]*Fabricators,* 926 F.2d at 1469.

to obtain working capital from a third-party lender after the Acquisition. As evidenced by this stipulation, Herby's could not have borrowed a similar amount from an informed outside source on acceptable terms, either to complete the acquisition or to obtain working capital. We find no error in the bankruptcy court's determination that Herby's was undercapitalized on the date of acquisition. The finding is fully supported by the evidence.

2. Delayed Perfection as Inequitable Conduct

As stated, undercapitalization alone generally is insufficient to justify equitable subordination. The Insiders contend that the bankruptcy court erroneously treated the untimely perfection of their security interests as sufficient additional inequitable conduct to warrant subordination. We need not decide, however, whether the combination of undercapitalization plus merely the late perfection of security for the avowed purpose of "hoping to get a secured lender" constitutes sufficient inequitable conduct to support subordination; the Insiders herein did more.

The Insiders never injected any equity capital into Herby's, electing instead to advance funds through tardily perfected secured loans made at times when no bona fide third-party lender would have done so. With full knowledge that Herby's was undercapitalized and insolvent, the Insiders persisted with their practice of advancing funds only in the form of loans.

Further, the loan from Summit was not initially reflected on Herby's books. When finally booked, it was listed as an unsecured loan. Similarly, the Dunnam debt was never definitively identified on Herby's books. Finally, the purported working capital loans from Snyder Co., totaling over one-half million dollars, were never evidenced by any form of loan agreement.

Summit received only minimal interest payments and no principal payments on its note. It perfected its security position only after Herby's stopped making the interest payments. Likewise, Dunnam received only five interest payments and did not perfect its security interest until seven months after Herby's stopped payments. The working capital advances from Snyder Co. apparently never purported to bear any interest. We find more than adequate evidence of inequitable conduct on the part of the Insiders to support the court's equitable subordination of their claims.

3. Recharacterization

The Insiders also charge that the bankruptcy court erred in recharacterizing as equity contributions the sums advanced by the Insiders as loans, citing as support *Tomlinson v. 1661 Corporation.*[20] They also complain that the Committee did not seek recharacterization, but only equitable subordination.

This point of error need not long detain us. We affirm the bankruptcy court's decision to subordinate the Insiders' claims to the *level* of equity, not any decision it might have made to recharacterize these advances from loan to equity. The Insiders concede in their brief that a court is authorized to recharacterize a loan as an equity contribution even when circumstances do not warrant equitable subordination. They further concede that in the instant case the practical effects of recharacterization on the one hand and equitable subordination to the level of equity on the other would be the same.

The judgment of the bankruptcy court declares that the claims of the Insiders "are hereby fully subordinated to those of the other unsecured creditors in this case." Even though that ranks the Insiders below the level of all other unsecured creditors, thereby putting the claims of the Insiders on the same *level* as equity holders, no mention of recharacterizing the Insiders' loans is made in the bankruptcy court's judgment. We recognize that language in the Memorandum Opinion and Order could be read to support the suggestion that the court recharacterized the claims at issue;[21] however, such an implicit recharacterization was not essential to the bankruptcy court's judgment. Consequently, we need not decide whether the bankruptcy court in fact recharacterized the loans as equity and, if so, whether such recharacterization was proper. The court *à quo* expressly subordinated the Insiders' claims to a position below the level of unsecured creditors and we find that such subordination was fully justified in this case.

4. Harm to Other Creditors

---

[20]377 F.2d 291 (5th Cir.1967).

[21]Although the Insider claimants' brief is unclear on the matter, this claim appears to be based on a single sentence in the bankruptcy court's memorandum opinion and order: "The claimants' attempt to characterize as loans what were, in fact, equity capital contributions to the debtor constitutes an aggravating circumstance."

The Insiders next maintain that their conduct did not harm the creditors of Herby's sufficiently to warrant subordination. They acknowledge, however, that the aggregate size of Herby's unsecured debt to its trade creditors increased from approximately $900,000 to over $4,600,000, and that the average number of days outstanding for trade payables increased almost elevenfold, from approximately seven to approximately seventy-five, between the date of Summit's acquisition of Herby's and its filing for relief in bankruptcy. Nevertheless, they insist that no evidence was presented to the bankruptcy court that any specific creditor was deceived or lured into extending additional unsecured credit by the actions as required by *Fabricators.* The Insiders' reliance on this argument is misplaced.

The *Fabricators* court found that inducing other creditors to extend additional credit through misrepresentations to be one form of inequitable conduct. In this point of error, the Insiders are not contesting the existence of inequitable conduct but, rather, whether such misconduct either produced injury to the arms-length creditors of the bankrupt or secured an unfair advantage for the miscreant claimants. Both injury and unfair advantage may be established by proving that a specific creditor was deceived or lured into extending additional credit to the bankrupt. "It is well established that actual fraud need not be shown for equitable subordination."[22] Mere good faith on the part of the Insiders would not negate the harm sustained by Herby's creditors; neither would it lessen the advantage gained by the Insiders.[23]

The bankruptcy court found that the Insiders' conduct harmed Herby's outside creditors by significantly increasing their trade credit exposure and by reducing their ultimate dividend in the liquidation. Most importantly, the court found that the Insiders had secured an unfair advantage by structuring their cash contributions to Herby's as loans, rather than as equity capital. If the Insiders were allowed to retain their ranking as unsecured creditors, they would have gained an advantage in the priority scheme by encouraging outside creditors to increase their credit exposure to Herby's.

---

[22]*Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.),* 622 F.2d 709, 720 (5th Cir.1980).

[23]*Id.*

Their efforts were successful; those trade creditors substantially increased their credit to Herby's during the period in question. We are persuaded that the inequitable conduct of the Insiders produced sufficient injury to the unsecured trade creditors and secured a sufficiently unfair advantage for the Insiders to warrant equitable subordination.

5. Cure by Nonassertion

The Insiders argue that they cured any prior inequitable conduct by not trying to enforce their liens in bankruptcy and by seeking only the status of general unsecured creditors. They previously admitted, however, in their answer to the Complaint to Subordinate Claims, that Summit's and Dunnam's liens were avoidable, that they could only assert unsecured claims against the estate, and that they had no security interest in the proceeds of the sale of Herby's assets.[24] They also admitted that Snyder never had a security interest to perfect. We cannot accept the proposition that the nonassertion of invalid claims results in the legal legerdemain suggested by the Insiders.

Even assuming that the Insiders had arguably valid claims as secured parties, their failure to file secured claims would not have cured what appears to be a previously obtained advantage. One might suggest that if the trade creditors had known that the Insiders early on had made *secured* loans to Herby's (thereby signaling that security was essential), the larger trade creditors would have declined to extend credit or would have sought secured status for themselves. The facts of the instant case support the proposition that the Insiders were able to lull the trade creditors into extending more unsecured credit to Herby's than they would have had they understood the Insiders' own assessment of Herby's financial health. The fact that the Insiders now seek only to be treated as unsecured creditors would not cure the effect of such deception of the trade creditors.

6. Degree of Subordination

The Insiders finally contend that their claims should have been subordinated only to the level of general unsecured creditors. "The prerogative to relegate claims to inferior status on equitable grounds, though broad, is not unlimited."[25] As noted earlier, a claim should be subordinated only to

---

[24]*See* 11 U.S.C. § 547(b).

[25]*Mobile Steel,* 563 F.2d at 699 (internal citation omitted).

the extent necessary to correct the harm or unfair advantage caused by the inequitable conduct.

The harm or unfair advantage that resulted from the Insiders' inequitable conduct is not limited to whatever may have resulted from their late perfection of Summit's and Dunnam's security interests. Both the harm and the unfair advantage are much more pervasive. Herby's was undercapitalized from the date of Summit's acquisition, and the Insiders did nothing to rectify that situation. Further, the advances from Summit and Dunnam were neither accurately nor timely reflected on Herby's financial records and the purported loans from Snyder Co. were never evidenced on the records or by any form of a loan agreement.

While these deceptive practices were being perpetrated, the aggregate sums owed by Herby's to its trade creditors increased by 3.7 million dollars. According to the record before us, the total amount distributable from Herby's estate will approximate 2.1 million dollars. If the claims of the Insiders are allowed a ranking equal to that of the unsecured trade creditors, the Insiders would receive approximately 757 of Herby's estate. This cannot be permitted. Even with subordination, the harm to the trade creditors will not be completely rectified. Anything less than full subordination would lend judicial approval to the unfair advantage secured by the Insiders. This we will not do.

AFFIRMED.