**In re TENNESSEE VALLEY STEEL CORPORATION, Debtor.**

**TENNESSEE VALLEY STEEL CORPORATION, by its Unsecured Creditors Committee, Plaintiff,**

v.

**B.T. COMMERCIAL CORPORATION, NationsBank of North Carolina, N.A., and The Morgan Stanley Leveraged Equity Fund II, Defendants.**

Bankruptcy No. 94–32813.
Adv. No. 95–3033.

United States Bankruptcy Court,
E.D. Tennessee.

June 27, 1995.

Frantz, McConnell & Seymour, Robert M. Bailey, Knoxville, TN, for plaintiff Tenn. Valley Steel Corp., by its Unsecured Creditors Committee.

Baker, Donelson, Bearman & Caldwell, Richard B. Gossett, Mark D. Hackett, Chattanooga, TN, Nelwyn I. Rhodes, Knoxville, TN, for defendants B.T. Commercial Corp. and NationsBank of N.C., N.A.

Hodges, Doughty & Carson, Thomas H. Dickenson, Knoxville, TN, for defendant Morgan Stanley Leveraged Equity Fund II.

## MEMORANDUM ON DEFENDANTS B.T. COMMERCIAL CORPORATION AND NATIONSBANK OF NORTH CAROLINA, N.A. MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

RICHARD S. STAIR, Jr., Chief Judge.

The Committee of Unsecured Creditors of Tennessee Valley Steel Corporation (Committee) commenced this adversary proceeding on March 10, 1995, with the filing of its Complaint, entitled "Complaint for Equitable Subordination or Reclassification of Claims and Other Relief" (Complaint), against three Defendants, B.T. Commercial Corporation (B.T.), NationsBank of North Carolina, N.A. (NationsBank),[1] and The Morgan Stanley Leveraged Equity Fund II (Morgan Stanley). On May 19, 1995, the Committee filed an Amended Complaint for Equitable Subordination or Reclassification of Claims and Other Relief (Amended Complaint), restating, substantially verbatim, the same averments contained in its Complaint. The only distinction between the Complaint and Amended Complaint is the capacity in which the Committee seeks relief. Whereas the original Complaint was filed by the Committee in its own name, the Amended Complaint is filed by the Committee in the name of the debtor, Tennessee Valley Steel Corporation.

The change by the Committee in the capacity by which it seeks relief through this adversary proceeding was presumably brought about by the motion presently before the court, a Motion to Dismiss Complaint or, in the Alternative, for Summary Judgment (Motion), filed by Defendants B.T. and NationsBank on April 18, 1995.[2] By their Motion, which is based on numerous grounds including the Committee's lack of standing to maintain this action, B.T. and NationsBank seek to have the Complaint dis-

missed pursuant to Fed.R.Civ.P. 12(b)(6), incorporated into Fed.R.Bankr.P. 7012(b), or alternatively, seek summary judgment pursuant to Fed.R.Civ.P. 56, incorporated into Fed.R.Bankr.P. 7056. The Motion will be addressed within the context of the Amended Complaint which supersedes the Complaint.

In support of their Motion, B.T. and NationsBank rely on affidavits of John F. Register, Jr., a vice-president of NationsBank, and Albert L. Fischetti, a senior vice-president of B.T.; portions of the transcripts of testimony of the following three individuals taken at examinations conducted pursuant to Fed. R.Bankr.P. 2004: (1) Morton I. Michelson, the debtor's president, chief executive officer, and chairman of the board of directors, (2) Robert H. Niehaus, a representative of Defendant Morgan Stanley, and (3) Mr. Fischetti; and the transcript of Mr. Michelson's testimony before the court at a hearing held on February 24, 1995. The Committee, in support of its Response of the Committee of Unsecured Creditors to the Motion to Dismiss Complaint, or in the Alternative, for Summary Judgment (Response) filed May 19, 1995, relies on a number of documents appended to its Response; testimony elicited at the Rule 2004 examinations or in court appearances by Messrs. Michelson, Niehaus, and Fischetti; and the testimony of Mr. Michelson elicited at the debtor's meeting of creditors held pursuant to 11 U.S.C.A. § 341 (West 1993). The Committee also filed a Supplement to Response of the Committee of Unsecured Creditors to the Motion to Dismiss Complaint, or in the Alternative, for Summary Judgment on June 21, 1995, in which it relies on the testimony of Mr. Michelson taken by deposition on June 20, 1995.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A), (B), (K), (O) (West 1993).

### I

Prior to the filing of its voluntary petition under Chapter 11 on November 11, 1994, the

---

1. In filings made incidental to this adversary proceeding, NationsBank refers to itself as NationsBank, N.A. (Carolinas), but does not aver that it was sued under an improper name. The court will not, therefore, concern itself with this distinction.

2. The third Defendant, Morgan Stanley, is not a party to the Motion.

debtor owned and operated a steel mill in Roane County, Tennessee. Approximately one week prior to the filing of its petition, the debtor terminated substantially all of its business activities, excepting those in connection with the sale of existing inventory, collection of accounts receivable, and preservation of plant and equipment. The debtor, however, subsequent to the commencement of its bankruptcy case, continued to manage its property as a debtor-in-possession in an effort to maximize its value to prospective purchasers as a going concern. On February 24, 1995, an Order was entered approving the sale of substantially all the debtor's assets for the sum of $30,500,000. This sale was consummated on April 28, 1995. Of the net proceeds realized from the sale, $9,500,-000 is on deposit in an interest-bearing escrow account at Chemical Bank to be disbursed pursuant to the terms of the Asset Purchase Agreement entered into between the debtor and purchaser on January 30, 1995, and $20,952,780.42 is on deposit in an interest-bearing account at First Tennessee Bank.[3]

Defendants B.T. and NationsBank are secured creditors asserting a lien against substantially all of the proceeds realized from the sale of the debtor's assets. Their secured claim arises from two prepetition loans: a $15,000,000 term loan to help finance completion of construction of the debtor's facilities and a $15,000,000 working capital revolving loan. The third Defendant, Morgan Stanley, is the majority shareholder of the debtor holding more than 72% of its outstanding shares of common stock. It is also the debtor's largest unsecured creditor.

The Committee, in its eighty-two paragraph Amended Complaint, avers (1) that the three Defendants engaged in "inequitable conduct" both before and after the debtor's commencement of its Chapter 11 case which resulted in injury to the creditors of the debtor or which conferred an unfair advantage on the Defendants; (2) that the Defendants' claims should be equitably subordinat-ed to the claims and interests of all unsecured creditors of the debtor pursuant to 11 U.S.C.A. § 510 (West 1993); (3) that the court should determine the extent, validity, and priority of the Defendants' claims pursuant to Fed.R.Bankr.P. 7001; (4) that the court should disallow the Defendants' claims pursuant to 11 U.S.C.A. § 502 (West 1993 & Supp.1995) and Fed.R.Bankr.P. 3007 to the extent they are subordinated to the claims of unsecured creditors; (5) that, alternatively, all or portions of the secured claims of B.T. and NationsBank and the unsecured claim of Morgan Stanley should be recharacterized as equity or capital injections and subordinated to the claims and interests of the unsecured creditors on a level of priority with other equity security holders; and (6) that the Committee, on the debtor's behalf, should be allowed to recover interest on all unsecured claims, together with attorneys' fees, costs, and expenses, prior to a distribution to the Defendants from the assets of the debtor's estate. Paragraphs 13 through 82 of the Amended Complaint contain the specific averments giving rise to the Committee's alleged claim of misconduct on the part of the Defendants.

By their Motion, B.T. and NationsBank seek dismissal of the Amended Complaint on the following grounds: (1) lack of standing by the Committee to bring this adversary proceeding; (2) lack of a colorable claim of equitable subordination by the Committee against the Defendants; and (3) the Committee's failure to join members of the debtor's board of directors as defendants, thus evidencing the Committee's bad faith in bringing this action. B.T. and NationsBank also contend that even if the court denies their Motion pursuant to Fed.R.Civ.P. 12(b)(6), they are entitled to summary judgment as a matter of law for the following reasons: (1) they engaged in no inequitable conduct in their dealings with the debtor and their claims are not, therefore, subject to equitable subordination; and (2) there is no evidence to

---

**3.** The court takes judicial notice of the Report of Sale of Property filed by the debtor in the bankruptcy case on May 2, 1995, to which it appended a copy of the April 28, 1995 Closing Statement related to the sale of its assets and the disposition of the proceeds. Fed.R.Evid. 201. Furthermore, by an Order entered June 20, 1995, the court directed the turnover of a portion of the net sale proceeds to B.T. and NationsBank.

support the Committee's assertion that the debtor was undercapitalized at the time they extended credit.

## II

Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding through Fed.R.Bankr.P. 7012(b), allows for the assertion, by motion, of the defense that the opposing party has failed "to state a claim upon which relief can be granted." In determining whether a Rule 12(b)(6) motion should be granted, the court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of [its] claims that would entitle [it] to relief." *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993); *see Mayer v. Mylod*, 988 F.2d 635, 637–38 (6th Cir.1993). Despite the liberalness of this standard, the plaintiff must present more than legal conclusions in its complaint. Factual allegations supporting the material elements of the legal theories upon which the plaintiff relies must be included in the complaint. *DeLorean Motor Co.*, 991 F.2d at 1240.

Pursuant to Fed.R.Civ.P. 56(c), made applicable to this adversary proceeding through Fed.R.Bankr.P. 7056, summary judgment is available only when a party is entitled to a judgment as a matter of law and when, after consideration of the evidence presented by the pleadings, affidavits, answers to interrog-

atories, and depositions in a light most favorable to the nonmoving party, there remain no genuine issues of material fact. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The factual dispute must be genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989).

## III

The majority of courts agree that creditors' committees are impliedly granted standing to initiate adversary proceedings through Bankruptcy Code § 1103(c)(5), § 1109(b), or both.[4] *See generally* Lawrence K. Snider, *Issues in Litigation: The Chapter 11 Creditors' Committee Right to Institute Suit*, 2 J.Bankr.L. & Prac. 779 (1992). Code § 1103(c)(5) permits creditors' committees to "perform such other services as are in the interest of those represented," and § 1109(b) provides that "[a] party in interest, including ... a creditors' committee, ... may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C.A. §§ 1103(c)(5), 1109(b) (West 1993). Under either section, the implied grant of standing is recognized as a "qualified right." Snider, *supra*, at 780 n. 5.

■ Numerous courts in applying § 1109(b)[5] qualify a creditors' committee's

---

**4.** The Creditors' Committee filed its Complaint, as amended, on behalf of the debtor; therefore, the court need only determine whether the Committee has derivative standing to proceed with this adversary proceeding. The issue of whether the Committee has standing separate and apart from the debtor will not be addressed. *See In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir.1990); *In re Nicolet, Inc.*, 80 B.R. 733, 738–39 (Bankr.E.D.Pa.1987), and cases cited therein. Further, because the Committee does not seek to avoid and recover preferential transfers pursuant to 11 U.S.C.A. § 547(b) (West 1993), the court need not be concerned with the conflict between § 547(b) and §§ 1103(c)(5) and 1109(b), as discussed in *NBD Park Ridge Bank v. SRJ Enterprises, Inc. (In re SRJ Enterprises, Inc.)*, 151 B.R. 189, 192–96 (Bankr.N.D.Ill.1993).

**5.** Lawrence Snider, in his 1992 *Journal of Bankruptcy Law & Practice* article, suggests that courts' reliance on § 1109(b) is misplaced:

There is nothing in the history of Section 1109(b) to suggest that its statutory predecessors authorized or were intended to authorize any party, other than a trustee or the representative of the creditors, to institute any suit on behalf of the creditors....

Furthermore, the specific language of Section 1109(b), in conjunction with other Code provisions, itself suggests that Section 1109(b) should not be construed as providing the legal basis for a committee's right to institute an adversary proceeding. Section 1109(b), it can be argued, only confers a "status" on an entity that, in turn, may take action only to the degree specifically authorized by the Code's other provisions. For example, only a "party in interest" can request the appointment of a trust-

standing by applying the following three-part test: (1) the creditors' committee must assert a colorable claim; (2) the debtor must have unjustifiably refused to pursue the claim; and (3) the creditors' committee must have obtained the permission of the bankruptcy court to initiate the action on behalf of the debtor.[6] *See, e.g., Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 (5th Cir.1988); *Unsecured Creditors Comm. v. Noyes (In re STN Enters., Inc.)*, 779 F.2d 901, 904–06 (2d Cir.1985).

### A. Colorable Claim

The colorable claim element of the three-part standing test requires the court to decide whether the Committee has asserted "claims for relief that on appropriate proof would support a recovery." *STN Enters., Inc.*, 779 F.2d at 905. Determining whether the Committee has asserted colorable claims in its Amended Complaint is not the equivalent of determining whether the Defendants are entitled to summary judgment.[7]

The Committee's claims for equitable subordination are based on Code § 510(c), which provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C.A. § 510(c) (West 1993). This statute, as interpreted by the U.S. Court of Appeals for the Sixth Circuit, allows for equitable subordination "if the claimholder is guilty of inequitable conduct or if the claim itself is of a status susceptible to subordination." [8] *United States v. Mansfield Tire &*

---

ee or examiner, the conversion or dismissal of a case, file a plan, object to confirmation of a plan or seek revocation of a plan. In other words, while Section 1109(b) may grant a committee the status to be "heard," the right accorded such status, it can be argued, is limited to the initiation of those activities that are specifically mentioned in other Code sections.

Snider, *supra,* at 781–82 (footnote omitted). However, Mr. Snider concludes that the error of relying on § 1109(b) is harmless because

the creditors' committee ... does have such standing under Section 1103(c)(5) of the Code.... This provision is almost identical to the language contained in former Bankruptcy Rule 11–29(a) of the Bankruptcy Act and to practice under Chapter XI of the Act, which has often been cited, without any authority, for finding that a creditors' committee has standing and the implied right to initiate an adversary proceeding under the Code.

*Id.* at 782 (footnotes omitted).

**6.** Courts relying on § 1103(c)(5), instead of § 1109(b), as the statutory basis for standing also focus on these three requirements. *See, e.g., In re Evergreen Valley Resort, Inc.*, 27 B.R. 75, 76 (Bankr.D.Me.1983); *Official Creditors' Comm. v. Alloy Automotive Co. (In re Wesco Prods. Co.)*, 22 B.R. 107, 109 (Bankr.N.D.Ill.1982).

**7.** NationsBank and B.T. argue that the Committee's claims are not supported by the evidence obtained during discovery that occurred prior to the Committee's filing of its Complaint on March 10, 1995; and therefore, no colorable claim ex-

ists. The Committee disagrees, stating in its May 19, 1995 Response to the Defendants' Motion that although three Rule 2004 examinations have been taken in this case, "absolutely no discovery has commenced in this lawsuit." The Committee has not objected to the Defendants' use of prediscovery documents and transcripts to support their Motion. In fact, the Committee relies on the same prediscovery evidence to support its Response. For the purpose of ruling on the Defendants' Motion, the court will, therefore, consider the evidence presented by the parties in support of or in opposition to the Defendants' Motion. *See Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 89 (6th Cir.1993) (failing to object to evidence entered into the record under Fed.R.Civ.P. 56(c) on a summary judgment motion constitutes waiver).

**8.** The Sixth Circuit's interpretation is based, in part, on the legislative history of § 510(c), an excerpt of which follows:

It is intended that the term "principles of equitable subordination" follow existing case law and leave to the courts development of this principle. To date, under existing law, a claim is generally subordinated only if [the] holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor.

124 Cong.Rec. S17406 (Oct. 6, 1978) (statement of Sen. DeConcini), *reprinted in* 1978

Rubber Co. (In re Mansfield Tire & Rubber Co.), 942 F.2d 1055, 1062 (6th Cir.1991), cert. denied, 502 U.S. 1092, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992); see First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.), 974 F.2d 712, 717–19 (6th Cir.1992). See generally United States v. Noland (In re First Truck Lines, Inc.), 48 F.3d 210, 213–18 (6th Cir.1995).

█ In applying § 510(c) and determining whether equitable subordination based on inequitable conduct is appropriate, the Sixth Circuit has adopted the Fifth Circuit's *Mobile Steel* test, which requires that the following three conditions be proven by a preponderance of the evidence:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir.1977) (citations omitted), *quoted in Baker & Getty Fin. Servs., Inc.*, 974 F.2d at 717–18; *see First Truck Lines, Inc.*, 48 F.3d at 213–18.

With regard to the first element, courts generally define inequitable conduct to include: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; [9] or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1467 (5th Cir.1991); *see Mobile Steel Co.*, 563 F.2d at 702–06. Undercapitalization alone is gener-

ally not sufficient to justify equitably subordinating a creditor's claim, but undercapitalization combined with "other inequitable conduct may justify subordination." *Fabricators, Inc.*, 926 F.2d at 1469; *see Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 132 (5th Cir. 1993).

The Committee's Amended Complaint contains numerous general and specific averments regarding the Defendants' alleged inequitable conduct. In paragraphs 12 and 67 of its Amended Complaint, the Committee has generally alleged that

due to the inequitable conduct of the Banks[, B.T. and NationsBank,] and Morgan Stanley, resulting in injury to the Debtor and unsecured creditors and by conferring an unfair advantage on the Banks and Morgan Stanley, as set forth herein, the claims and interests of the Banks, and Morgan Stanley should be equitably subordinated to the claims and interests of the unsecured creditors in this Chapter 11 proceeding or their claims and interests should be reclassified such that said claims and interests are subordinate to the claims of unsecured creditors.

. . . .

... That the Banks and Morgan Stanley engaged in a pattern of conduct whereby the Banks assumed the power of fiduciaries, usurped the power of the Board of Directors and officers of the Debtor, exercised dominion and control over the Debtor, substituted their business judgment for the Debtor's and so controlled the Debtor as to make it a mere instrumentality or alter ego of the Banks and Morgan Stanley and to place the Banks and Morgan Stan-

U.S.C.C.A.N. 6505, 6521; 124 Cong.Rec. H11089 (Sept. 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.C.C.A.N. 6436, 6452; *see United States v. Mansfield Tire & Rubber Co. (In re Mansfield Tire & Rubber Co.)*, 942 F.2d 1055, 1062 (6th Cir.1991), *cert. denied*, 502 U.S. 1092, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992); *see also United States v. Noland (In re First Truck Lines, Inc.)*, 48 F.3d 210, 215 (6th Cir.1995) ("[T]he statements of Representative Edwards and Senator DeConcini provide the most reliable indicia of the legislative intent as to the meaning of the phrase 'principles of equitable subordination.' ").

9. The term "undercapitalization" generally refers to the insufficiency of capital contributions made to the debtor corporation. Inadequate capitalization may be established by the testimony of a skilled financial analyst that the capitalization "would definitely be insufficient to support a business of the size and nature of the [debtor] in light of the circumstances existing at the time the [debtor] was capitalized."
*Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 131–32 (5th Cir.1993) (quoting *Mobile Steel Co.*, 563 F.2d at 703).

ley in a position of fiduciaries as to the Debtor and the other creditors of the Debtor in the handling of the Debtor's affairs.

To support these general allegations, specific allegations regarding the Defendants' alleged inequitable conduct are contained throughout the Amended Complaint.[10] At paragraphs 23 through 27, the Committee alleges that Morgan Stanley, in an effort to prevent the dilution of its equity position, sought financing from B.T. and NationsBank although "the projections of the original business plan[, among other things,] called for Morgan Stanley to inject additional capital"; and further alleges that B.T. and Nations-Bank extended $45 million in credit to the debtor "primarily as an attempt to enhance a relationship [with] Morgan Stanley." At paragraph 35, the Committee alleges:

> By letter dated April 12, 1994, the Banks declared a technical default under the Credit Agreement for the Debtor's failure to, among other things, produce audited financial statements for 1993. However, representatives of the Banks instructed the Debtor not to produce audited financial statements due to the fact that the Debtor was in default ... and the Debtor's operations had generated, and were continuing to generate, income losses that were substantially in excess of the projections of the business plan ... so that the outside auditors could not issue an unqualified opinion that the Debtor could continue to operate as a going concern.

Paragraphs 40 and 41 allege that the Defendants "negotiated and consummated new credit terms with little if any involvement of the Debtor," and required the debtor to engage in a course of action that induced "trade creditors to continue to extend unsecured credit and otherwise deal with the Debtor as an ongoing concern." Paragraph 43 alleges that as of August 1994, NationsBank and B.T.,

> with Morgan Stanley's approval, ... were exercising control over the Debtor's operations and policies by requiring weekly, and later daily, approvals of expenditures; limiting capital expenditures, by directing the Debtor to stretch the payment of unsecured creditors and to cease efforts to produce merchant quality steel bar and instead to solely produce rebar steel. That at that time, the Debtor could more easily produce rebar steel but could sell it only at a substantially lower market price than the potential price for merchant quality steel.[11]

Paragraphs 46 through 50 explain the alleged strategy that B.T. and NationsBank used to allegedly improve its position to the detriment of the debtor's unsecured creditors:

> During the August 10, 1994 meeting [held to discuss the business "scenarios" prepared by the Defendants], Robert Niehaus, one of Morgan Stanley's employees and representatives and a director of the Debtor, introduced the Banks' representative, Albert L. Fischetti, to the Debtor's Board of Directors and announced that he would be in control and calling the shots concerning the Debtor.
>
> ... Mr. Fischetti then inquired as to the status of the Debtor's trade payables and how far they were, and could be, "stretched out", including a specific inquiry as to how far they could stretch out the largest vendors, such as the scrap supplier.
>
> [B]y late October and early November, 1994, the Banks, with the direct or implicit consent of Morgan Stanley, had assumed such control over the Debtor that they dictated the Debtor's purchase and use of supplies and materials, the Debtor's sale of inventories, the Debtor's payment of trade debt including the terms and timing of such payments, the Debtor's payment of wages and other salaries of its employees; and generally exercised dominion and control over the day-to-day activities of the Debtor.

---

**10.** Numerous general and specific allegations are contained in the Amended Complaint. The court will not reiterate in this Memorandum each paragraph of the Amended Complaint that is material to a determination of the issues raised in the Defendants' Motion. Rather, the court will limit its discussion to certain paragraphs that contain allegations representative of those found throughout the Amended Complaint.

**11.** Paragraph 56 also summarizes the extent of control B.T. and NationsBank allegedly exercised over the debtor:

... That from and after August 10, 1994, the Debtor was required to request approval of its expenditures and its operational decisions from Mr. Fischetti or other representatives of the Banks.

... That the Banks directed the Debtor to keep the mill "hot and running" to increase its inventory production while at the same time "conserving cash", which included the "stretching" of the accounts payable to Debtor's trade creditors. This strategy by the Banks allowed inventory and accounts receivable in which it claimed a lien to increase while increasing accounts payable to the detriment of unsecured creditors, and was apparently a part of a plan to liquidate the assets of the Debtor for the benefit of the Banks and Morgan Stanley and to the detriment of unsecured creditors.[12]

With regard to the allegation that the debtor was undercapitalized at the time B.T. and NationsBank extended credit, the Committee specifically avers in the Amended Complaint that Morgan Stanley obtained credit for the debtor through B.T. and NationsBank instead of making the additional equity contribution called for by the debtor's original business plan, and that additional credit was extended to the debtor after the Defendants had determined that the debtor was incapable of generating positive cash flows and unable to service its existing debts.

The numerous allegations set forth in the Amended Complaint cannot presently be supported by evidence obtained during discovery because discovery in this adversary proceeding has just commenced.[13] However, the Committee supports its allegations with arguments presented in its Response to the Defendants' Motion, and with the implied assertion made in its Response that more evidence will be forthcoming following discovery.[14] Furthermore, in support of its allegations, the Committee's Response sets forth numerous factual averments and provides corresponding citations to various prediscovery documents and transcripts for certain averments. The factual averments, corroborated in part by the record presently before the court, follow in material part:

[The loan made by B.T. and NationsBank to the debtor] was described as a relationship loan.... Movants, Morgan Stanley and Mr. Niehaus, an employee of Morgan Stanley, negotiated the terms of debtor's loan and the amendments and renegotiations thereafter without consultation with Mr. Michelson or other members of debtor's board of directors. Movants directed debtor to not publish its year end financial statement. As early as the spring of 1994 and continuing thereafter, Morgan Stanley and Movants were discussing and developing scenarios to sell the debtor without the knowledge or prior approval of the Board of Directors of debtor. The sale of the debtor and/or the sale of Morgan Stanley's interest in the debtor was not part of the business plan developed by the debtor and Morgan Stanley.... Mr. Niehaus and representatives of Movants met in New York to discuss their joint interests in the debtor in early summer 1994 before the Movants called a meeting of the debtor in Harriman in August, 1994. Movants had knowledge of debtor's losses, balance sheets, increases in inventory and accounts payables. Movants were aware of debtor's capital needs, problems with its learning curves and under capitalization, but provided overlines of credit in 1994. Mr. Niehaus and Mr. Fischetti called for a meeting of the debtor's representatives in Harriman, Tennessee in August, 1994. Before said meeting, Movants created scenarios concerning the operation of debtor's busi-

---

**12.** To support these allegations, the Committee sets forth in paragraph 60 of the Amended Complaint that from January 1994 through November 1994, the debtor's inventory increased from "approximately" $3.4 million to "approximately" $10.3 million, and accounts receivable increased from "approximately" $2.5 million to "approximately" $4.2 million, while unpaid trade payables increased from "approximately" $4 million to "approximately" $6.5 million.

**13.** The deposition of Mr. Michelson was taken on June 20, 1995, upon notice served by B.T. and NationsBank.

**14.** The Committee states in its Response filed May 19, 1995, that "absolutely no discovery has commenced in this lawsuit," and that the Rule 2004 examinations identified numerous individuals that may have discoverable information.

ness and presented them to debtor. Mr. Fischetti had apparently sent said scenarios to a potential purchaser. Mr. Fischetti testified these scenarios were "suggestions". Mr. Michelson believed them to be directives to the debtor. At the meeting, Mr. Niehaus and Mr. Fischetti indicated that Mr. Fischetti was now in control of the debtor and would be calling the shots concerning the debtor. Thereafter, Mr. Fischetti continued to make "suggestions" concerning the operations of the debtor while Mr. Michelson testified that Movants continued to control the operations of the debtor.

Resp. of the Comm. of Unsecured Creditors to the Mot. to Dismiss Compl., or in the Alternative, for Summ.J. at 13–15 (citations omitted).

The Defendants argue that the inequitable conduct allegations contained within the Committee's Complaint are insufficient to support a colorable claim of equitable subordination because B.T. and NationsBank should be treated as noninsiders for the purpose of applying the *Mobile Steel* test. Application of the *Mobile Steel* test varies when the creditor is a noninsider: noninsiders must be proven " 'guilty of gross misconduct tantamount to "fraud, overreaching or spoliation to the detriment of others," ' " while the standard applied to insiders requires that their " 'dealings with the debtor ... be subjected to more exacting scrutiny.' " *Baker &*

*Getty Fin. Servs., Inc.*, 974 F.2d at 718 (quoting *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983) (quoting *In re W.T. Grant Co.*, 4 B.R. 53, 75 (Bankr.S.D.N.Y. 1980), *aff'd*, 20 B.R. 186 (S.D.N.Y.1982), *aff'd*, 699 F.2d 599 (2d Cir.1983))); *see Mobile Steel Co.*, 563 F.2d at 702 ("[W]e must examine the conduct of fiduciary-claimants 'with a large measure of watchful care.' " (quoting *Washburn v. Green*, 133 U.S. 30, 42, 44, 10 S.Ct. 280, 284, 33 L.Ed. 516 (1890))).

If B.T. and NationsBank did in fact take over the operations of the debtor and become its alter ego, they may fit within the Bankruptcy Code definition of the term "insider," which includes a "person in control of the [corporate] debtor." 11 U.S.C.A. § 101(31)(B)(iii) (West 1993); *see* 11 U.S.C.A. § 101(41) (West 1993 & Supp.1995) (defining the term "person" to include an "individual, partnership, and corporation"). Assuming the Defendants are more properly classified as noninsiders, the Committee's Complaint sufficiently includes allegations of " 'gross misconduct tantamount to "fraud, overreaching or spoliation to the detriment of others." ' " [15] *Baker & Getty Fin. Servs., Inc.*, 974 F.2d at 718 (quoting *Teltronics Servs., Inc.*, 29 B.R. at 169 (quoting *W.T. Grant Co.*, 4 B.R. at 75)). However, at this stage of the adversary proceeding, the Committee has not had the full opportunity of discovery. [16] Whether NationsBank and B.T.

---

**15.** As previously stated, the Amended Complaint alleges that the Defendants took over the debtor's day-to-day operations and instituted a business strategy detrimental to the unsecured creditors. To support these allegations, the Committee sets forth in paragraph 60 of the Amended Complaint that from January 1994 through November 1994, the debtor's inventory increased from "approximately" $3.4 million to "approximately" $10.3 million, and accounts receivable increased from "approximately" $2.5 million to "approximately" $4.2 million, while unpaid trade payables increased from "approximately" $4 million to "approximately" $6.5 million.

The Committee also alleges in paragraph 75 of its Amended Complaint

[t]hat to the extent the Court determines the Banks and/or Morgan Stanley do not have a fiduciary responsibility to the Debtor and its creditors, the Committee would allege and aver that the Banks and/or Morgan Stanley have engaged in egregious misconduct includ-

ing use of the Debtor as their instrumentality, overreaching, mismanagement, substitution of their business judgment for that of the Debtor, spoliation of assets, undercapitalization of the Debtor, and other misconduct. In addition, when funds were advanced or invested by the Banks and Morgan Stanley, the Debtor could not have obtained similar amounts of money from an informed source on the strength of its assets alone.

**16.** Discovery in this adversary proceeding is governed by Fed.R.Civ.P. 26 through 37, incorporated into Fed.R.Bankr.P. 7026 through 7037. More specifically, oral testimony is taken by deposition pursuant to Fed.R.Civ.P. 30 and its admissibility is governed by Fed.R.Civ.P. 32. Discovery includes depositions, interrogatories, requests for production of documents, requests for admissions, and the disclosure of expert witnesses and testimony. The scope of discovery is defined by Fed.R.Civ.P. 26(b), which allows for the discovery of "any matter, not privileged,

were "person[s] in control of the debtor" and whether they should be held to " 'more exacting scrutiny' " are issues left for determination following discovery and an analysis of additional case law. § 101(31)(B)(iii); *Baker & Getty Fin. Servs., Inc.*, 974 F.2d at 718 (quoting *Teltronics Servs., Inc.*, 29 B.R. at 169). At this juncture, the court need only determine whether the Committee's Amended Complaint contains colorable claims.

In applying the law of equitable subordination as established by the Sixth Circuit and the Bankruptcy Code, the allegations contained within the Committee's Complaint support its prayer for relief in the form of equitable subordination pursuant to Code § 510(c). Accordingly, the court concludes that the Committee has included specific averments in its Complaint which allege that

> which is relevant to the subject matter involved in the pending action."
>
> Conversely, the scope of the Rule 2004 examinations taken prior to the Committee's filing of this adversary proceeding was limited pursuant to Fed.R.Bankr.P. 2004(b), which provides in material part:
>
>> The examination of an entity under this rule ... may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge. In ... a reorganization case under chapter 11 of the Code, ... the examination may also relate to the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any other matter relevant to the case or to the formulation of a plan.
>
> The opportunity provided to the Committee to participate in the Rule 2004 examinations does not equate to engaging in discovery as provided for in Fed.R.Civ.P. 26 through 37. The Committee must be allowed, among other things, to depose the individuals identified in the Rule 2004 examinations as allegedly having discoverable information, and to serve on the Defendants and receive responses to interrogatories and requests for production of documents. Further, to the extent expert witnesses will be utilized, the parties must identify their respective experts and disclose their testimony during the discovery process. Accordingly, the court finds that the Committee has not had a sufficient opportunity to engage in discovery.

**17.** The Sixth Circuit recently stated:

the Defendants' inequitable conduct "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *Mobile Steel Co.*, 563 F.2d at 700. There is no support for the argument that granting equitable subordination in this case would "be inconsistent with the provisions of the Bankruptcy [Code]."[17] *Id.*

For the foregoing reasons, the court finds that the Committee's § 510(c) equitable subordination claims based on the Defendants' allegedly inequitable conduct are colorable claims. The first element of the standing test has been satisfied with regard to the Committee's § 510(c) claims through which the Committee seeks to subordinate the Defendants' claims to the claims and interests of all unsecured creditors of the debtor.[18]

> [T]he bankruptcy court's equitable subordination powers must be exercised within the confines of the Bankruptcy Code. An examination of the Code reveals that the bankruptcy courts have the power to subordinate any claim to any other claim under the principles of equitable subordination; Congress has left the development of these principles to the courts. The wisdom of such a course is obvious, given the many ways in which parties to a bankruptcy seek advantage in recouping losses.
>
> *First Truck Lines, Inc.*, 48 F.3d at 218 (citation omitted).

**18.** The court need not address the recharacterization claim raised by the Committee in Count 3 of its Complaint. The Defendants, through their Motion, have only argued that no colorable claim exists with respect to the Committee's equitable subordination claims.

The Committee's claim seeking a recharacterization of the Defendants' loans as capital contributions is distinct from its claims seeking equitable subordination pursuant to Code § 510(c) based on the Defendants' inequitable conduct, defined to include undercapitalization. *See Blasbalg v. Tarro (In re Hyperion Enters., Inc.)*, 158 B.R. 555, 559–63 (D.R.I.1993), and cases cited therein; *see also Herby's Foods, Inc.*, 2 F.3d at 132–33 ("[I]f an insider makes a loan to an undercapitalized corporation, the combination of undercapitalization and the insider loan may allow the bankruptcy court to recharacterize the loan as a capital contribution, or to equitably subordinate the loan to the claims of other creditors." (footnote omitted)); *Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625, 630 (6th Cir.1986) (identifying eleven factors for the purpose of determining whether an advance is more properly classified as a capital contribution or a loan), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

## B. Debtor's Unjustified Refusal

In determining whether the debtor unjustifiably refused to pursue this action, courts consider whether conflicts of interest exist between the debtor and the parties against whom the creditors' committee's derivative action was or will be brought; whether the creditors' interests are protected despite the debtor's refusal; whether allowing the creditors' committee to pursue the action on the debtor's behalf will benefit the estate; and whether appointing a trustee and allowing the trustee, as opposed to the creditors' committee, to pursue the action or converting the Chapter 11 case to a Chapter 7 would be more beneficial to the estate. *See, e.g., Louisiana World Exposition,* 858 F.2d at 248–52; *STN Enters., Inc.,* 779 F.2d at 905–06.

Defendants B.T. and NationsBank assert in their brief that the debtor decided not to pursue the claims set forth in the Committee's Complaint because the claims are "without merit." The Committee argues that the debtor has not pursued the claims because of conflicts of interest, asserting in its Response that

[i]t is evident from the allegations of the Complaint, Movant's brief and this response that the debtor's Board of Directors, which was controlled by employees of the defendant Morgan Stanley, would have had to vote to sue Morgan Stanley in order to pursue the present lawsuit.... Additionally, the Committee has alleged as part of its Complaint that Movants are closely associated with, alteregos of and/or co-conspirators with Morgan Stanley making the debtor's pursuit of such defendants an obvious conflict of interest.

NationsBank and B.T., in denying these allegations, argue in their Reply of Lenders to Response of the Committee to Motion to Dismiss Complaint or, in the Alternative, for Summary Judgment (Reply) filed on May 24, 1995, that

the Debtor has brought several other adversary proceedings against the Lenders, and no conflict of interest has ever been alleged by any interested party, including the Committee, with respect to Debtor's involvement in those proceedings. Moreover, even if the court assumed *arguendo* that the Lenders were fiduciaries of the Debtor, as alleged by the Committee, this would still not create a conflict of interest which would prevent the Debtor from suing the Lenders.... Lenders would simply show that Morgan Stanley's involvement with the Debtor has certainly not curtailed the Debtor's propensity for filing other adversary proceedings against the Lenders in this case.

Based on the Plaintiff's and Defendants' arguments and given the fact that discovery has not been completed in this adversary proceeding, the court finds that the Plaintiff's allegations regarding conflicts of interest are sufficiently supported by the available evidence. Morgan Stanley is the majority shareholder of the debtor which creates "an appearance of a conflict of interest in any action by the debtor against" Morgan Stanley. *Chemical Separations Corp. v. Foster Wheeler Corp. (In re Chemical Separations Corp.),* 32 B.R. 816, 819 (Bankr.E.D.Tenn. 1983); *see Louisiana World Exposition,* 858 F.2d at 235, 249–50. With regard to B.T. and NationsBank, the court has determined that the Committee has raised colorable claims involving conspiracy, fiduciary, and alter-ego theories, which are inapposite to those claims initiated by the debtor in other adversary proceedings.[19]

Furthermore, the debtor in this case has been liquidated, resulting in there being no opportunity for a successful reorganization.

---

**19.** The debtor, along with other parties in interest, has initiated two adversary proceedings against B.T. and NationsBank. The first, Adv. Proc. No. 94–3174, was commenced with a Complaint to Determine Validity of a Lien, or Alternatively, to Avoid a Lien, filed by the debtor and the Unsecured Creditors' Committee, in which they allege that B.T. and NationsBank failed to perfect their lien in the debtor's motor vehicles. The second adversary proceeding, No. 95–3035, was initiated by the debtor, the Unsecured Creditors' Committee, and Southern Alloys and Metals Corporation with the filing of a Complaint and Objection to Claims of B.T. Commercial Corporation and NationsBank of North Carolina, N.A. In Adv.Proc. No. 95–3035, the plaintiffs challenge the validity of B.T.'s and NationsBank's lien in a leasehold interest known as the Ahler Lease and allege that their lien is unperfected.

The debtor has no financial incentive to litigate the claims set forth in the Committee's Complaint.[20] Conversely, the Committee is the real party in interest in this adversary proceeding with the unsecured creditors being motivated to initiate and pursue this adversary proceeding by the opportunity to receive a share of the debtor's liquidated estate.

Moreover, the debtor has refused, apparently because of conflicts of interest, to litigate the matters set forth in the Committee's Complaint. The allegations regarding the debtor's refusal to initiate this adversary, which appear in the Committee's Response filed in opposition to the Defendants' Motion, are as follows:

> The debtor had the opportunity to file its own action or join in the Committee's proposed action prior to March 10, 1995. The debtor knew that the Committee would be pursuing such an action and debtor was not confused as to what the Committee would do and debtor had ample opportunity to determine its own course of action. The debtor did not pursue such an action by March 10, 1995. It is evident from the allegations of the Complaint, Movant's brief and this response that the debtor's Board of Directors, which was controlled by employees of the defendant Morgan Stanley, would have had to vote to sue Morgan Stanley in order to pursue the present lawsuit. This fact alone is reason enough for the Committee to pursue this lawsuit if the debtor chose not to do so.

Through a supplemental response filed on June 21, 1995, to which a portion of the transcript from the June 20, 1995 deposition of Mr. Michelson is affixed, the Committee provided support for these allegations. Mr. Michelson testified as follows:

> BY MS. RHODES[, attorney for B.T. and NationsBank]:
>
> . . . .
>
> Q. ... To your knowledge, did the committee ever request that the debtor file such an action?
>
> A. Yes.

Q. And what was the response of the debtor?

A. I made a response. I told them through Mr. Kizer[, attorney for the debtor,] that they were spinning their wheels because my board was comprised of the majority of the party they were trying to sue so it wasn't going to be a common sense thing. I wasn't going to have a majority of my own board vindicate an action by the debtor to sue themselves. Secondly, when I asked the other board members what their feeling was, two of them told me that they could not talk or comment on advice of counsel on the issue. That left me.

Q. Who were those board members?

A. Those were Mr. Baisley and Mr. Liff, the two Liffs[ ], Adam and Noah. That left me almost by myself to decide whether or not I was empowered enough to institute this action without full authority of the board, and I felt I wasn't so I rendered that opinion to Mr. Kizer....

. . . .

Q. When you said that the question was whether the debtor would sue members of [its] own board, that was with regard to Morgan Stanley?

A. They would be suing themselves. They would be bringing a suit against themselves.

Q. What about with regard to the lenders? I mean the lenders were not members of the debtors' [sic] board...

A. I broached that question with the majority of the board and the Morgan Stanley staff and was told that they had no desire and would not vote to bring a suit against the bankers in an equitable subordination action. I asked Mr. Liff and Mr. Baisley, and my recollection is, at this point, that I got the same response, on the advice of counsel because of pending litigation that they were involved with that they would not vote that action either.

. . . .

---

20. The court recognizes that the debtor, as the debtor-in-possession, is responsible for performing certain functions and fulfilling certain duties pursuant to 11 U.S.C.A. § 1107(a) (West 1993). However, any award obtained in this adversary proceeding will not financially benefit the debtor.

Q. So Mr. Baisley and Mr. Liff felt there would be some sort of conflict in their directing that type of action?

A. That's what they told me on advice of counsel.

The court doubts that if the Committee is denied standing, the debtor will attempt to initiate an adversary proceeding. Moreover, any attempt by the debtor to initiate an adversary proceeding will be limited by the court's Order entered January 20, 1995, as amended March 6, 1995, which required that all adversary proceedings in this bankruptcy case be filed by March 10, 1995.

For the foregoing reasons, the court concludes that the debtor unjustifiably refused to pursue the claims presently asserted by the Committee in this adversary proceeding.

### C. Court Approval

The Committee has not obtained the court's express permission to pursue this action on behalf of the debtor, and the debtor has not been afforded an opportunity to explain to the court why it has refused to litigate the claims. However, the debtor was "informed of the [C]ommittee's intent to assert a right of the debtor" prior to the Committee's filing of its Complaint on March 10, 1995. *Chemical Separations Corp.*, 32 B.R. at 819. Further, on January 20, 1995, this court entered an Order, as amended March 6, 1995, requiring that all adversary proceedings be filed by March 10, 1995. During the hearings held prior to the March 10, 1995 deadline, the Committee asserted that it would file an equitable subordination claim against the Defendants if the debtor refused to do so. Moreover, the Committee was involved in the setting of the March 10, 1995 deadline.[21]

This court, speaking through Judge Bare, has determined that under certain circumstances an order permitting the creditors' committee to pursue its action can be entered nunc pro tunc. *See id.* at 819. In *Chemical Separations Corp.*, the court found that the general right to be heard granted to creditors' committees through § 1109 " 'would be an empty grant unless those who have such right are also given the right to do something where those who should will not.' " *Id.* at 818 (quoting *Official Comm. of Unsecured Creditors v. I. Hyman Corp. (In re Joyanna Holitogs, Inc.)*, 21 B.R. 323, 326 (Bankr. S.D.N.Y.1982)). After determining that the debtor refused to pursue the action because of a conflict of interest, the court noted that the creditors' committee should have sought leave of court before commencing the adversary proceeding in order to ensure that the debtor was "informed of the committee's intent to assert a right of the debtor ... and ... afforded an opportunity to explain to the court the reason, if any, for declining to prosecute the claim." *Id.* at 819. Because of the circumstances of the case, the court entered an order *nunc pro tunc* to permit the committee to proceed with its action.

Based on the plain language of § 1103(c)(5), the court concludes that the Committee, by initiating this adversary proceeding, is performing services that "are in the interest of those represented." Moreover, Code § 1109(b) grants creditors' committees the right to "raise and ... appear and be heard on any issue in a" Chapter 11 case. The claims raised in this adversary proceeding are issues arising from the debtor's Chapter 11 case,[22] and to deny standing to the Creditors' Committee in this case will inappropriately limit its right to "raise ... any issue" in the debtor's Chapter 11 case.

---

**21.** The January 20, 1995 Order, which set a March 7, 1995 deadline for filing complaints, was approved for entry by the attorneys for the debtor, B.T., NationsBank, the United States Trustee, the Committee, and Southern Alloys and Metals Corporation (SAMCO). On March 2, 1995, SAMCO and the Committee filed a Motion seeking an extension of the March 7, 1995 deadline, which was granted by a March 6, 1995 Agreed Order approved for entry by the attorneys for the debtor, B.T., NationsBank, Morgan Stanley, the United States Trustee, the Committee, and SAMCO.

**22.** The court finds no justification for limiting the application of § 1109(b) to issues raised in a debtor's bankruptcy case as opposed to issues raised in adversary proceedings pursuant to Fed. R.Bankr.P. 7001. *See Chemical Separations Corp.*, 32 B.R. at 818 ("This court disagrees with the conclusion ... that Code § 1109(b) is applicable in cases but not in adversary proceedings.").

■ For the foregoing reasons, the court concludes that under § 1109(b), as is consistent with the *Chemical Separations Corp.* decision of this court, the Committee has standing to proceed with its derivative action against the Defendants.[23] Assuming the only correct statutory basis for granting standing to the Creditors' Committee is § 1103(c)(5), the end result in this case remains the same. *See supra* note 5. The Defendants' Motion will be denied with regard to the standing issue. An Order will be entered *nunc pro tunc* granting the Creditors' Committee permission to pursue this adversary proceeding, except with regard to the Committee's § 502 claim as hereinafter discussed.

### IV

■ The Committee's Complaint contains one request in the prayer for relief that cannot withstand scrutiny under Fed. R.Civ.P. 12(b)(6). The requested relief is that the Defendants' claims be disallowed pursuant to 11 U.S.C.A. § 502 (West 1993 & Supp.1995) and Fed.R.Bankr.P. 3007 to the extent they are equitably subordinated to the claims of the unsecured creditors. The Committee has failed to provide the court with any specific factual or legal support regarding the basis for its request that the Defendants' claims be disallowed pursuant to Code § 502 and Rule 3007. Specifically, the Committee has failed to identify what subsections of § 502 are applicable in this case and to include factual allegations that support its request for relief based on § 502.

The court finds that the Bankruptcy Code and Rules do not support the disallowance of B.T.'s and NationsBank's claims to the extent they are equitably subordinated pursuant to § 510(c). Claims are only to be subordinated under § 510(c), not disallowed. *See Pepper v. Litton,* 308 U.S. 295, 303–12, 60 S.Ct. 238, 244–47, 84 L.Ed. 281 (1939) (distinguishing between subordination and disallow-

ance); *Mobile Steel Co.,* 563 F.2d at 701 ("[C]laims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct."); *Diazo Serv. Co. v. Redmond (In re Diazo Serv. Co.),* 144 B.R. 771, 777–78 (Bankr.M.D.Tenn. 1992) (Lundin, J.). *Compare* § 502 *with* § 510(c).

Based on the foregoing, the court concludes that the Committee has failed to state a claim upon which relief in the form of disallowance can be granted. The Committee's Complaint will be dismissed to the extent the Committee seeks, pursuant to § 502, a disallowance of B.T.'s and NationsBank's claims that are subject to subordination pursuant to § 510(c).

### V

Defendants B.T. and NationsBank assert in their brief filed in support of their Motion on April 18, 1995, that parties have not been joined in this action, based solely on the following argument:

[T]he Committee has purposefully omitted the Liffs and Baisley as defendants in this action, even though they, like Morgan Stanley's representatives, (i) were members of Debtor's board of directors; (ii) voted in favor of, participated in, or otherwise ratified or approved of each of the actions of which the Committee complains in the Complaint; and (iii) have unsecured claims against Debtor's estate.

Lenders[, B.T. and NationsBank,] would show the Court that complete relief cannot be accorded among the Committee, Lenders and Morgan Stanley without joining the Liffs and Baisley and possibly their affiliated creditor entities. Lenders face substantial risk of incurring double, multiple, or otherwise inconsistent obligations

---

**23.** The court does not, however, conclude that regardless of the circumstances, a creditors' committee is permitted to initiate an adversary proceeding. The factors considered by courts in determining whether creditors' committees have standing serve as useful mechanisms to prevent committees from, among other things, raising claims for which no relief can be granted, raising claims that have been or will be raised by the

debtor or trustee, and raising claims that will adversely affect the debtor's ability to successfully reorganize. Under different circumstances, this court might have determined that based on an application of these factors, the circumstances did not support the entry of an order nunc pro tunc; and therefore, the Committee lacked standing to initiate this adversary proceeding.

and claims if others who are so integral to the "facts" alleged by the Committee are not joined in this action. Lenders or Morgan Stanley might be saddled with liability which should properly be borne by Messrs. Liff and Baisley.

The Defendants provide no further explanation of or legal support for this argument in their brief. In their subsequent Reply filed on May 24, 1995, the Defendants also fail to provide legal support for their argument; however, they include additional factual assertions regarding what they term "the incestuous nature of the relationship between SAMCO[, Southern Alloys and Metals Corporation], its principals, the Debtor and the Committee," and the conflict of interest between Mr. Griffin, Chairman of the Creditors' Committee, and his employer, SAMCO, and include an additional argument that Mr. Griffin and SAMCO should be removed from the Creditors' Committee.

The rules of joinder are set forth in Fed. R.Civ.P. 19, made applicable to this adversary proceeding through Fed.R.Bankr.P. 7019, which provides in material part:

(a) **Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. . . .

(b) **Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

The Defendants argue that because other parties have not been joined, the Plaintiff's Complaint should be dismissed. This argument, to the extent it refers to parties regarded as dispensable under Rule 19, directly contradicts Fed.R.Civ.P. 21, made applicable to this proceeding through Fed. R.Bankr.P. 7021, which provides:

**Rule 21. Misjoinder and Non–Joinder of Parties.**

Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

The Committee asserts in its Response that joinder of additional defendants is inappropriate at this time and contends that it has initiated its derivative action against those entities believed to have committed acts that would support a claim for equitable subordination. If the Committee identifies during the discovery process additional parties that should be joined, those parties can be joined, if feasible, pursuant to Fed. R.Civ.P. 19 and 21. Likewise, if the Committee finds that certain Defendants should not have been named, those parties can be dismissed from this adversary proceeding pursuant to Fed.R.Civ.P. 21. Further, if the

Defendants have third party claims that they wish to assert, appropriate filings can be made to initiate those claims in this adversary proceeding.[24]

■ The court need not identify all parties that could potentially be joined in this adversary proceeding or identify what third party claims might be asserted by the Defendants. B.T. and NationsBank have not provided sufficient legal or factual support for a finding that a certain individual or entity should be joined because "in the person's absence complete relief cannot be accorded among those already parties," or because the person, claiming an interest related to the Committee's derivative action, "is so situated that the disposition of the action in the person's absence may ... impair or impede the person's ability to protect that interest or ... leave [B.T., NationsBank, or Morgan Stanley] ... subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed.R.Civ.P. 19(a). Accordingly, the Defendants' Motion will be denied to the extent it seeks a dismissal of the Complaint based on nonjoinder of parties and to the extent it seeks joinder of additional parties.

### VI

■ Defendants NationsBank and B.T. also seek summary judgment on the Committee's equitable subordination claims. In order to obtain summary judgment, NationsBank and B.T. are required to

> meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the nonmovant's case.... This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) (footnote omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Before a court can require a party opposing a summary judgment motion to present affirmative evidence sufficient to defeat the motion, that party must be "afforded sufficient time for discovery." *Id.* at 1478.

Furthermore, pursuant to Fed.R.Civ.P. 56(f),

> [s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

"A major objective of subdivision (f) has been to insure that a diligent party is given a reasonable opportunity to prepare [its] case. In keeping with this philosophy, the granting of summary judgment will be held to be error when discovery is not yet completed...." 10A Charles A. Wright et al., Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2741 (2d ed. 1983 & Supp.1995) (footnotes omitted).

The Committee filed its Complaint on March 10, 1995, raising numerous complex and colorable claims. B.T. and NationsBank filed their summary judgment motion on April 18, 1995, less than six weeks after the filing of the Complaint. The only evidence available to the Committee has been derived from three Rule 2004 examinations, the debtor's § 341 meeting of creditors, affidavits submitted in conjunction with the Defendants' Motion, hearings before the court on other matters arising in the debtor's bankruptcy case, and a recent deposition of Mr. Michelson. Discovery is just beginning in this adversary proceeding,[25] and the court finds that the Committee has not been allowed sufficient time to proceed with discovery.

---

**24.** Simply arguing that the Defendants "might be saddled with liability [that] should properly be borne by Messrs. Liff and Baisley" does not support the Defendants' argument that the Committee's Amended Complaint should be dismissed for nonjoinder.

**25.** The Rule 2004 examinations, § 341 meeting, and hearings held in the debtor's bankruptcy case cannot be considered discovery in this adversary proceeding. *See supra* note 16.

The arguments presented by the parties regarding the Defendants' Motion also make clear that in the absence of available evidence, granting summary judgment to either party at this time is inappropriate because genuine issues of material fact exist in this adversary proceeding.

Based on the foregoing, the Defendants' Motion to Dismiss Complaint or, in the Alternative, for Summary Judgment will be denied, except to the extent the Defendants seek to dismiss the Plaintiff's request for relief in the form of disallowing the Defendants' claims. The court will conduct a scheduling conference in this adversary proceeding, at which a deadline for discovery will be set. Once discovery has been completed, the Defendants will be permitted to renew their summary judgment motion.